**MINNESOTA PUBLIC INTEREST RE-SEARCH GROUP, Plaintiff,**

v.

**Earl L. BUTZ, Individually, and as Secretary of Agriculture, et al., Defendants.**

**No. 4–72 Civ. 598.**

United States District Court,
D. Minnesota,
Fourth Division.

April 16, 1973.

———◆———

Dayton, Seck & Herman, by Charles K. Dayton and Gerald L. Seck, Minneapolis, Minn., for plaintiff.

Robt. G. Renner, U. S. Atty., by Neal J. Shapiro, Asst. U. S. Atty., Minneapolis, Minn., for Government and individual defendants.

Dorsey, Marquart, Windhorst, West & Halladay, by Curtis L. Roy and Wm. J. Keppel, Minneapolis, Minn., for defendants Boise Cascade Corp., Northwest Paper Co. and Northern Forest Products, Ltd.

O'Connor, Green, Thomas, Walter & Kelley by Joe A. Walters and Frank J. Walz, Minneapolis, Minn., for defendant Consolidated Papers, Inc.

Ronald W. Walls, Ely, Minn., for defendant Kainz Logging Co.

## OPINION AND ORDER

MILES W. LORD, District Judge.

This matter now comes before the Court for a decision after a full trial on the merits that commenced on January 2, 1973 and ended on January 31, 1973. The trial on the merits was consolidated with plaintiff's motion for a preliminary injunction by an Order of this Court of December 19, 1972. The Court issued the Order in this matter on February 2, 1973, and an amendment to that Order on February 8, 1973. The Court issued these Orders before the full opinion could be drafted for the reasons detailed in the February 2, 1973 Order at pages 2–3.

Plaintiff's complaint was filed on November 24, 1972. In it plaintiff seeks a temporary and a permanent injunction restraining defendants from logging [1] in the Boundary Waters Canoe Area (hereinafter referred to as BWCA) until all the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., (hereinafter referred to as NEPA) and the attendant regulations have been complied with by the Department of Agriculture and its subordinate agency, the United States Forest Service (hereinafter referred to as the Forest Service).[2] In seeking this relief, plaintiff claims that the Forest Service's present BWCA Management Plan as to timber sales, and more particularly actions taken pursuant to that Plan after January 1, 1970 (the effective date of NEPA), amount to "major federal actions significantly affecting the quality of the human environment" within the meaning of § 102(2)(A) of NEPA. Plaintiff further asserts that a detailed environmental impact statement (hereinafter referred to as an impact statement), as required by § 102(2)(C) of NEPA, should have been completed before any such actions were taken, and that logging must now be enjoined in the BWCA until an impact statement, complying with all the requirements of the aforementioned sections of NEPA, is prepared by the Forest Service.

The plaintiff filed a Second Amended Complaint on January 8, 1973 in which it seeks to have logging in the virgin forest[2a] areas of the BWCA per-

---

1. Logging refers to the whole process involved in the cutting of timber.

2. The plaintiff seeks to enjoin timber cutting on the eleven currently active timber sales in the BWCA; that is, the Shell Lake, Sunnydale, Jerry Creek, Beartrap, Old Road, Trail Block, Compartment 38 Block, East Road Block, West Tofte, East Tofte, and Black Spruce Sales. These sales are described in detail at pages 610–604, infra.

2a. Virgin forest is defined at page 594, infra.

manently enjoined because of the express requirement of § 4(d)(5)[3] of the National Wilderness Preservation System Act of 1964 (hereinafter referred to as the Wilderness Act), that the Secretary of Agriculture should maintain the primitive character of the BWCA by imposing restrictions which are necessary to that end. Plaintiff asserts that the primitive character of the virgin forest areas of the BWCA can only be maintained by prohibiting logging in such areas. In view of the fact that the entire BWCA Management Plan is now under review by the Forest Service, that it may be substantially changed by the summer of 1973 and that the Forest Service will prepare a complete impact statement in regard thereto by April 1973, the Court ruled during the course of the trial that this issue would be held in abeyance until after the Forest Service has completed this process. The Court now reaffirms this earlier ruling.

In an answer filed on January 11, 1973, the Government, on behalf of the Government defendants takes the position that there have been no "major federal actions significantly affecting the human environment" since January 1, 1970 in regard to the active timber sales in the BWCA, and that, as a result, no impact statement is required under NEPA. The Government does admit that such a statement must be filed in regard to the new BWCA Management Plan which will be completed in the spring of 1973, and, in fact, the Forest Service has represented that an impact statement on this new Plan will be finished some time in April, 1973, but contends that logging should not be halted pending the completion of this process.

In addition to the above, the Government has alleged several affirmative defenses. The first affirmative defense alleged is that the allegations of plaintiff's complaint fail to state a claim upon which relief can be granted. The second affirmative defense claimed is that plaintiff is guilty of laches, thus waiving its rights in connection with this action, in not bringing this action earlier in 1972 when it first became aware of the fact that the impact statement would not be completed until April, 1973. The third affirmative defense asserted by the Government is that this action was not duly authorized by an appropriate resolution of plaintiff's Board of Directors as required by its Articles of Incorporation and its By-laws. The final affirmative defense claimed is that the commencement of this action by plaintiff was beyond the scope of its powers as set out in its Articles of Incorporation.

In its answer, filed on December 29, 1972, defendant Consolidated Paper, Inc. (hereinafter referred to as Consolidated) also takes the position that there has been no violation of NEPA by the Forest Service, and that logging in the BWCA should not be halted pending completion of the Forest Service's impact statement in April, 1973. Consolidated asserts all the affirmative defenses alleged by the Government. Consolidated further asserts that the "without unnecessary restriction on other uses, including that of timber" language of § 4(d)(5)[4] of the Wilderness Act shows Congressional intent that logging should be allowed in the BWCA, or at least in the Portal Zone [5] thereof, and that, as a result, Consolidated has an affirmative legal right to continue cutting timber on its present timber sales within the BWCA.

In addition to the use of the latter statutory provision as a defense, Consolidated has made it the basis of a Counterclaim for a Declaratory Judgment that the total prohibition of logging in the BWCA sought in plaintiff's Second Amended Complaint is an "unnecessary restriction" as a matter of law and for an order enjoining MPIRG from interfering with Consolidated's existing tim-

---

3. § 4(d)(5), 16 U.S.C. § 1133(d)(5) is quoted at pages 591–592, *infra.*

4. *See,* note 3, *supra.*

5. *See,* discussion in text at page 594, *infra.*

ber sales in the BWCA until it can establish that such sales are inconsistent with the provisions of the Wilderness Act. Consolidated relies on the same statutory provision in asserting its Crossclaim against the Government defendants. In this Crossclaim, filed on January 2, 1973, it asks for an order determining that the total proscription of logging in the Portal Zone of the BWCA would constitute an illegal "unnecessary restriction" of timber use. In view of the Court's prior ruling on the new issues raised by plaintiff's Second Amended Complaint, Consolidated's Counterclaim and Crossclaim will be held in abeyance, as they relate to its claim that the Wilderness Act affirmatively requires that logging be allowed in the BWCA, until after the Forest Service has prepared its new BWCA Management plan and the accompanying impact statement. However, Consolidated's Counterclaim and Crossclaim will be considered as they relate to the question of whether the Court should grant an injunction proscribing logging in the BWCA pending such actions by the Forest Service.

In their answer, filed January 2, 1973, defendants Boise Cascade Corporation (hereinafter referred to as Boise), the Northwest Paper Company, (hereinafter referred to as Northwest) and Northern Forest Products, Ltd. (hereinafter referred to as Northern) join in the position of the Government and Consolidated that there has been no violation of NEPA by the Forest Service, that logging in the BWCA should not be halted pending completion of the Forest Service's impact statement in April, 1973 and that plaintiff has been guilty of laches. In addition, these defendants assert that plaintiff lacks standing to maintain this action because no members of plaintiff will suffer injury to a legally protectable right as a result of continued logging in the BWCA.

In its answer, filed on January 12, 1972, defendant Kainz Logging Company (hereinafter referred to as Kainz) joined in the position of the other defendants that there has been no violation of NEPA by the Forest Service and that logging in the BWCA should not be halted pending completion of the Forest Service's impact statement in April 1973. Kainz also joins with some of the other defendants in asserting that the plaintiff lacks standing to bring this action and that plaintiff is guilty of laches.

In addition to the above, Kainz made virtually the same Crossclaim against the Government defendants as did Consolidated, and Kainz relies on the same statutory provision and reasoning as does Consolidated. Kainz also brought a Counterclaim asserting that the plaintiff brought this action with the intent to interfere with its contractual relationship with the Forest Service and to interfere with and interrupt its potential source of timber in the BWCA. Kainz further assets that plaintiff's interference was due to its total disregard of certain provisions of the Wilderness Act, and as such, was malicious in nature and done with the intent to cause Kainz damage. Kainz seeks damages in the amount of $200,000 plus its costs and disbursements in its Counterclaim.

### Statutory History

In 1909 pursuant to the Forest Reserve Act of 1891, 16 U.S.C. § 471, 1,159,700 acres of land in Northern Minnesota was designated in a Presidential Proclamation as the Superior National Forest. Congress set forth the basic management directives for maintaining the National Forests in the Organic Act of June 4, 1897, 16 U.S.C. §§ 475, 476, which provided that:

No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States . . ..

In recognition of the importance of maintaining this area in a primitive

state a large portion of the Superior National Forest was designated as the Superior Primitive Area by the Secretary of Agriculture in 1926, under regulations promulgated by the Secretary, no permanent roads were to be constructed and severe restrictions were placed on commercial logging. In 1930, Congress passed the Shipstead-Newton-Nolan Act, 16 U.S.C. § 577, to conserve the natural beauty of shorelines of lakes and streams for recreational use. In order to carry out this purpose it was provided that:

> The principle of conserving the natural beauty of shore lines, for recreational use shall apply to all Federal lands which border upon any boundary lake or stream contiguous to this area, or any other lake or stream within this area which is now or eventually to be in general use for boat or canoe travel, and that for the purpose of carrying out this principle logging of all such shores to a depth of four hundred feet from the natural water line is forbidden, except as the Forest Service of the Department of Agriculture may see fit in particular instances to vary the distance for practical reasons: Provided, that in no case shall logging of any timber other than diseased, insect infected, dying or dead be permitted closer to the natural shoreline than two hundred feet, except where necessary to open areas for banking grounds, landings and other uses connected with logging operations. 16 U.S.C. § 577a.

In 1939 much of the Superior Primitive Area, plus additional areas acquired by expansion of the Forest in 1936, were classified as the Superior, Caribou, and Little Indian Sioux Roadless Areas, pursuant to regulations of the Secretary of Agriculture. The policy of prohibiting permanent roads and of restricting commercial logging in accordance with the Shipstead-Newton-Nolan Act was continued. In 1941, the Secretary set up a special zone consisting of about 362,000 acres, lying just to the south of the Canadian border, in which commercial logging was prohibited.

With the advent of a new management plan in 1948, the Superior Roadless Areas were reclassified under Secretary of Agriculture regulation U–3, which provided that:

> Lands which qualify in general as wilderness except that certain economic values are dominant with recreation value, may be classified as roadless areas * * *. The management objective will be to preserve as much of the wilderness value as possible and still permit use of timber and other industrial uses. Only temporary roads will be permitted in roadless areas. Resource uses will be managed to preserve all possible wilderness values.

The 1948 Management Plan for administration of the Roadless Areas was similar to that established in 1939 but greater restrictions on commercial activities and vehicle use were imposed. With only minor modifications, management of the Superior Roadless Areas [6] was conducted under the guidelines of the 1948 Management Plan until the passage of the Wilderness Act in 1964 and the promulgation of the rules thereunder in 1965.

In passing the Wilderness Act, Congress attempted to insure that certain primitive and natural areas, such as the BWCA, were classified as wilderness areas and that these areas would be preserved for the benefit of future generations. The Congressional declaration of policy is set forth in 16 U.S.C. § 1131 (a):

> In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Con-

---

6. In 1958, the Roadless Areas were re-named as the Boundary Waters Canoe Area.

gress to secure for the American people of present and futu.e generations the benefits of an enduring resource of wilderness. For this purpose there is hereby established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as "wilderness areas", and these shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness; and no Federal lands shall be designated as "wilderness areas" except as provided for in this chapter or by a subsequent Act.

Wilderness is defined as follows:

A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value. 16 U.S.C. § 1131(c).

Other sections of the Wilderness Act set out the responsibility of the federal agency administering a Wilderness area:

Except as otherwise provided in this chapter, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character. Except as otherwise provided in this chapter, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use. 16 U.S.C. § 1133(b).

and the uses which are generally prohibited in such areas:

Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area. 16 U.S.C. § 1133(c)

Of greatest importance to the present case is the special section of the Wilderness Act dealing with the BWCA:

Other provisions of this chapter to the contrary notwithstanding, the management of the Boundary Waters Canoe Area, formerly designated as the Superior, Little Indian Sioux, and Caribou Roadless Areas, in the Superior National Forest, Minnesota, shall be in accordance with regulations established by the Secretary of Agriculture in accordance with the general purpose of maintaining, without un-

necessary restrictions on other uses, including that of timber, the primitive character of the area, particularly in the vicinity of lakes, streams, and portages: *Provided,* That nothing in this chapter shall preclude the continuance within the area of any already established use of motorboats. 16 U.S.C. § 1133(d)(5).

During the time that Congress was considering what became the Wilderness Act, and specifically on May 21, 1964, Secretary of Agriculture Freeman appointed the BWCA Review Committee, known as the Selke Committee. Among other things, the Selke Committee was specifically appointed to study the issue of whether logging and road building should be curtailed or completely discontinued in the BWCA. The recommendations resulting from the Committee's investigation were summarized in a letter to Secretary Freeman of December 15, 1954. That letter stated in part that:

> The [BWCA] should be managed as a primitive type recreation area, with only those uses permitted which are compatible therewith and in compliance with the Shipstead-Newton-Nolan Law, the Wilderness Act, and other applicable Federal Laws.
>
> . . .
>
> Timber harvesting as a crop is necessary in the management of the BWCA outside of the no-cut zone. The long range protection of the Area for recreational purposes requires that the large stands of over-aged timber which exist in many portions of the BWCA outside of the no-cut zone should be promptly harvested in a manner which will return the forest to a balanced timber age classification and provide the best example of multiple use forest management. However, harvesting methods must fit the recreational emphasis to which this Area has been dedicated and be consistent with and compatible to management of a primitive type recreation area.

The road fill in Finn Lake is an example of the thoughtless destruction of the Area's aesthetic qualities which should never be tolerated. The present plan of management for this Area should be immediately revised to provide details of management and require methods of timber harvesting which will enhance and protect the area outside the no-cut zone as a primitive type recreation area.

The Selke Committee also recommended that approximately 150,000 acres in various parts of the BWCA be immediately added to the no-cut zone.

On January 12, 1965, Secretary Freeman issued a statement on the Committee's report. He agreed with the Committee's recommendation as to what the general objective of management should be (i.e., as a primitive-type recreation area), and stated that:

> In accepting this recommendation of the Committee, I want to emphasize that the main characteristic of the Canoe Area which is important in wilderness considerations is the spectacular abundance of lakes and streams in a natural setting. The opportunity to use these lakes and streams for primitive-type recreation sets this Area apart from others in the National Forests. Objectives of management must particularly emphasize the preservation and maintenance of the primitive character of the Area in the vicinity of lakes and streams.

The Secretary also followed the Committee's recommendation to add 150,000 acres to the no-cut zone, and in addition, earmarked another 100,000 acres of a similar character for eventual inclusion in the no-cut zone.[7] Finally, the Secretary made the following observations and rulings as to commercial logging in the BWCA:

> Commercial timber cutting will be continued in the remaining one-third of the Canoe Country, subject to strict application of the principle that there

7. This additional 100,000 acres is referred to elsewhere as the 1975 addition to the Interior (no-cut) Zone.

will be no cutting which will present a hazard to maintaining a desirable recreation environment adjacent to lakes and water courses.

The harvesting of pulpwood and manufacture of secondary products provide the major employment in some counties. Transfer of all the timber in the Canoe Country to "no cut" status would seriously jeopardize the economy and put people out of work. To aid these industries, the Forest Service will continue to improve the forest outside the Canoe Area through better fire suppression programs, control of insect and disease epidemics, and reforestation.

Pursuant to the Wilderness Act and his statement on the Selke Committee's findings, the Secretary promulgated special regulations governing the BWCA on December 21, 1965. These regulations were slightly altered in an amendment dated August 16, 1968, and are now set forth at 36 C.F.R. § 251.85. The latest BWCA Management Plan was formulated by the Forest Service in 1964 and amended to comply with the Wilderness Act and the regulations referred to above in 1966. This Management Plan was codified in the latest BWCA Management Handbook which was adopted on August 12, 1969.

In 1969, Congress recognized the growing public concern over environmental matters by passing NEPA. The Congressional declaration of policy is set forth in 42 U.S.C. § 4331 which provides, in part, that:

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences:

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

In addition, various procedural requirements were set up to insure that environmental factors were considered by Federal agencies. Of particular importance in this matter is 42 U.S.C. § 4332 which provides, in part, that:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented.

(iii) alternatives to the proposed action.

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

## FINDINGS OF FACT

### The BWCA

At the present time the Superior National Forest is comprised of slightly over 3,000,000 acres, of which about 1,-060,000 acres are in the BWCA. The BWCA is separated into two zones, the Interior Zone and the Portal Zone, pursuant to 36 C.F.R. § 251.85. The Interior Zone consists of about 640,000 acres, including the approximately 100,000 acres in the 1975 addition, situated mainly in the northern portion of the BWCA along the Canadian border.[8] Timber cutting is prohibited in this Zone. The Portal Zone consists of about 425,000 acres generally situated in the southern portion of the BWCA. Timber cutting is allowed in this Zone, and has occurred extensively between 1940 and the present time. In recent years about 45,000 cords of timber on about 3,000 acres of land has been cut in the Portal Zone each year.

In the BWCA as a whole (including portions of both zones) there is about 520,000 acres of virgin forest. The term "virgin forest" was used during the trial and is used here to describe forest areas that have resulted entirely from natural factors as opposed to man-influenced or controlled factors, such as logging, planting and seeding. These are areas which are in virtually the same condition they would have been in had man never evolved. Such areas meet the definition of "wilderness" in the Wilderness Act.[8(a)] That is, they are undeveloped areas where the natural eco-systems are untrammeled by man,

---

8. The Interior Zone is merely an extension of the special "no cut" zone of 362,-000 acres set up in 1941.

8(a). *See*, 16 U.S.C. § 1131(c) which is quoted at pages 590–591, *supra*.

where man is a visitor who does not remain and whose works are substantially unnoticeable, where the land has retained its "primeval character and influence," where there are outstanding opportunities for solitude and a primitive, unconfined type of recreation and which contain ecological, geographical and other features of scenic, scientific, educational and historical value.

The evidence showed, and the Court finds, that the virgin forest areas of the BWCA are unique. In conjunction with the contiguous virgin forest areas of the Canadian Quetico-Superior Forest, it is by far the largest forest of its type[8(aa)] in an area of numerous lakes and streams in the world. In addition, the BWCA is the only such forest area, as well as the largest wilderness area, in the eastern United States.

The Wilderness Act provides that wilderness areas are to be devoted to the following uses: recreational, scenic, scientific, educational, conservation and hitorical.[8(b)] The evidence showed that the BWCA is particularly well suited for these uses.

The BWCA has become increasingly important as a source of wilderness recreation for the public. For instance, about 98,000 people visited the BWCA in 1966, while about 163,000 people visited it in 1972. In fact, some of the testimony at trial indicated that the BWCA was actually being or would soon be overused by visitors so that the Forest Service is considering putting some restrictions on use as has been done in some of our National Parks. About 90% of the visitor use consists of canoeing and other activities on the waterways during the summer, 5% consists of snowmobiling on the waterways during the winter, and the remaining 5% of the use consists mainly of use of the trails for hiking in the summer and for snowshoeing or cross country skiing in the winter. After considering all of the evidence, the Court must conclude that primitive types of recreation in the BWCA are very important to a growing number of people.

The scenic use is self-explanatory. The rustic, natural scenery of the BWCA is one of the main reasons for its heavy recreational use, and the beauty of the area was evident from the testimony and the numerous pictures and slides introduced into evidence.

The value and importance of the BWCA for scientific and educational purposes is undisputed, but there was a dispute as to just how much virgin forest area is required for these purposes. Plaintiff's witnesses, including Drs. Heinselman, Cushing and Wright, believe that the full 520,000 acres of remaining virgin forest should be preserved in order to protect the integrity and reliability of certain studies that are now being carried on [8(c)] and those that are planned for the future. They testified that to insure the purity of the gene pool [8(d)] and to protect the studies mentioned above from unnatural (i.e., man dominated) factors, as large an area of virgin forest as possible is required. Some of defendants' witnesses, and especially Dr. Kaufford and Mr. Ahlgren, testified that they felt that the virgin forest areas of the present Interior Zone, in which logging is presently prohibited, are sufficiently large for scientific and educational purposes. The Court has considered this conflicting testimony and has concluded that large areas of virgin forest are required for at least some wilderness studies such as large scale eco-system studies, watershed studies, animal migration studies and the study of interchanges of genetic ma-

---

8(aa). *See*, discussion in text at pages 609 to 611, *infra*.

8(b). The exact language of 16 U.S.C. § 1133(b) is quoted at page 591, *supra*.

8(c). Some of these studies are described at page 605, *infra*.

8(d). A gene pool is the mix of the genetic material of all the species found in a certain area. A gene pool must be pure, in the sense of being unaffected by man-dominated factors, if the results of scientific studies of various wilderness phenomena are to retain their validity.

terial. The Court reaches no conclusion as to exactly how much virgin forest is required for scientific and educational purposes, but it does note that the concept of what is adequate or inadequate for such purposes often changes as more information and learning on the subject becomes available. That area which might be deemed adequate at the present stage of our learning may later be regarded as totally inadequate.

Congress lists "conservation" as a use, but it is more properly a management goal. Conservation is, in its broadest sense, the concern which man has that nature be kept in as pristine a state as possible. This includes not only the timber, but all the other plant life, the animals, the fish, or, in short, the whole eco-system. In this sense, the "use" of conservation suggests, as is explicitly stated in other provisions of the Wilderness Act, that the wilderness or primitive character of the BWCA is to be preserved.

The historical use can be interpreted in several ways. However, in view of the concern of Congress that wilderness areas be preserved for future generations,[8(e)] the Court believes that the most reasonable interpretation is that it means that such areas are to be preserved in their primitive states so that future generations will be able to see and appreciate a truly natural environment. The virgin forest areas of the BWCA are perfect for such a use because they are still in their natural state.

In conclusion, the Court notes that witness after witness spoke in almost reverent tones of the rare beauty, the scenery, the solitude and the "oneness with nature" that they found while in the BWCA. It was termed a gem, a jewel, and likened to a rare antique of ancient vintage. The evidence clearly showed that there is no area like it nor can there ever be another of its kind.

*The Parties*

*Plaintiff.* The plaintiff, Minnesota Public Interest Research Group (hereinafter sometimes referred to as MPIRG), is a non-profit Minnesota corporation, with its main place of business at Minneapolis, Minnesota. Its members are approximately 90,000 students at some 18 colleges and universities located throughout the State of Minnesota who agree to pay $3.00 a year to fund the corporation. The corporate purpose of MPIRG, as set out in its articles of Incorporation, is "to promote the public interest and social welfare." This purpose was further explained by two employees of plaintiff who testified in this matter. They testified that MPIRG seeks to fulfill its purpose by representing various positions on matters of public concern which it, through its Board of Directors and staff, feels should be represented, but which are not being represented or are being ineffectively represented. They stated that the public interest and social welfare is best promoted by ensuring that all points of view are considered before decisions on public policy are made.

The basic management of MPIRG is vested in a Board of Directors. This Board is made up of students elected at the various participating colleges and universities. MPIRG employs about 14 people on its staff, including lawyers, researchers and clerical help, to handle its day to day operations. The Board defines the general areas of concern in which it desires the staff to work.[9] The staff then attempts to determine, through various types of research, what points of view should be represented by MPIRG according to the criteria discussed above and what actions might be most effective in representing such views. They then present their conclusion to the Board, and, if the Board agrees, it passes a resolution authorizing the staff to go ahead with the

8(e). *See,* 16 U.S.C. § 1131(a) which is quoted at pages 590–591, *supra.*

9. These general areas of concern are each referred to as a "project".

project and to take certain actions.[10] The staff then works on the project, with a great deal of discretion as to exactly what actions will be taken and when they will be taken, except that litigation and positions on legislation must be authorized by the Board.

The "BWCA timber cutting project" was generally approved by the Board at a meeting, held on January 9, 1972. In addition, at the same meeting, the Board authorized the staff to "get involved in going to court" on the project "if necessary." At its meeting of October 28, 1972, the Board, by voice vote, reaffirmed the staff's power to bring suit. These actions of the Board are set forth in the official minutes of Board meetings which are a part of MPIRG's official files, and the Court finds that they were taken in accordance with the requirements of MPIRG's By-laws as noted above.

The evidence shows [11] that at least 34 members of MPIRG have used the BWCA in the past and intend to continue doing so in the future. Thirty-two of the affiants represented that they used the BWCA in a general way while two affiants stated that they backpacked on several trails in the BWCA, one affiant stated that he had been canoeing several times in the BWCA and one affiant stated that he had been snowshoeing and winter camping in the BWCA. The Court finds that at least these 34 members of MPIRG have used the BWCA for recreation in the past, will so use it in the future, and will be affected by continued logging in the BWCA. Furthermore, it is probable that many other members of MPIRG have used the BWCA in the past, will use it in the future, and will be so affected.

*Government Defendants.* The government defendants are Earl L. Butz, Secretary of Agriculture; John B. McGuire, Chief of the Forest Service; Jay Cravens, Regional Forester; and Harold Andersen, Supervisor of the Superior National Forest.

*Private Defendants.*

*Emil Abramson.* Mr. Abramson originally purchased one of the timber sales in controversy here,[12] but thereafter assigned his interest in that sale to Boise and, as a result, has not been an active party in this matter.

*Consolidated Papers, Inc. (Consolidated).* Consolidated is a Wisconsin corporation doing business in Minnesota with its principal place of business at Wisconsin Rapids, Wisconsin. Consolidated's principal product is enamel-coated paper like that used for *Time.* This is important because under the technology now employed at Consolidated's mills, the production of such paper requires a recipe of about 50% aspen and 50% spruce. The evidence clearly showed that aspen, a hardwood, is the most abundant timber specie in northern Minnesota, especially in those areas outside of the BWCA, and that spruce and other softwood species are in relatively short supply.[13]

In order to meet its requirements for spruce during the first half of 1973,

10. The By-laws of MPIRG provide that actions can be taken or authorized by the passage of an appropriate motion or resolution at a meeting of the Board of Directors. A simple majority constitutes a quorum at such meetings, and, in order to pass a motion or resolution, an affirmative vote of at least two-thirds of the Board members voting is required.

11. This evidence is contained in affidavits, filed on November 27, 1972, in support of plaintiff's motion for a preliminary injunction. The parties stipulated during the trial that these affidavits are evidence in this matter and that each affiant would testify to those facts contained in his or her affidavit if called as a witness. This stipulation was entered into to expedite the trial of this matter.

12. The Shell Lake Sale.

13. Hardwood generally refers to non-conifer trees (those having "short-fiber" wood) which in northern Minnesota means mostly aspen and birch plus a small amount of other species such as maple. Softwood refers to conifer trees (those having "long-fiber" wood) such as red and white pine, jackpine, black and white spruce, balsam, tamarack, etc.

Consolidated plans to have about 14,000 cords of that specie cut this winter on six sales in the BWCA which it either owns or from which it is obtaining wood.[14] Consolidated asserts that this wood is very important to it and that it would be substantially injured if logging were enjoined on any of those sales, although it admitted that none of its mills would be forced to close or even reduce operations in such event.

In 1972, Consolidated's total consumption of wood was 456,200 cords, of which 121,500 cords were spruce. This means that in 1973, the BWCA will be the source of about 2½% of its total wood requirements and about 10% of its spruce requirements. It is thus clear that Consolidated procures most of its wood from sources other than its sales within the BWCA. Consolidated owns, or owns the cutting rights on, about 570,000 acres of land in areas relatively close to the BWCA,[15] including about 46,000 acres in Minnesota. Consolidated estimates that there are 2,886,000 cords of all species of timber on such land which is mature enough to be cut for pulpwood purposes. Included in that total are about 1,608,000 cords of spruce. In Minnesota alone, Consolidated has about 77,000 cords of all species of timber and about 16,000 cords of spruce.

Given these figures, the Court finds that Consolidated has sufficient sources of spruce which could be cut this winter to compensate for the loss of any spruce which it planned to have cut in the BWCA this winter due to any injunction issued by this Court. Therefore, the Court concludes that Consolidated would not be greatly injured if timber cutting were enjoined in the BWCA pending the completion of the impact statement by the Forest Service. However, the Court does find that Consolidated might be injured to the extent that it is forced to pay a somewhat higher price to obtain the remainder of the 14,000 cords of spruce it intended to procure from the BWCA.[16] This possible increase in price might be due to either increase in transportation costs if wood must be brought in from a location farther from Consolidated's mills than the BWCA or the increased costs of putting roads and other improvements into areas not planned for cutting this winter if the logger is able to pass such increased costs on to Consolidated.

The Court also finds that Consolidated could remedy any injury which might otherwise befall its loggers on the various sales in the BWCA by providing them with other timber to cut on its own land or on the federal, state and county timber sales it owns located outside the BWCA.[17]

*The Northwest Paper Company (Northwest).* Northwest is a Delaware corporation doing business in Minnesota, with its principal place of business at Cloquet, Minnesota. Northwest is a pulp and paper manufacturer that specializes in high grade printing and writing paper. It has paper and pulp mills in Cloquet and Brainerd, Minnesota, and directly employs about 2,000 people. Northwest requires a supply of about 280,000 cords of wood a year to fulfill its needs. Under present technology, the recipe for the production of the type of paper Northwest specializes in is 50% hardwood and 50% softwood.

14. The sales owned by Consolidated from which they would be receiving spruce this winter are Black Spruce, East Road Block, Compartment 38 Block and Trail Block. The sales from which it is receiving spruce are East and West Tofte.

15. That is, in Wisconsin, Michigan and Canada as well as Minnesota.

16. Timber cutting has continued as originally planned on all the sales in which Consolidated is involved during the trial of this matter and so a part of the 14,000 cords has already been cut.

17. The Court notes that there are almost 16,000 cords of merchantable spruce owned by Consolidated outside the BWCA but in Minnesota, that Consolidated planned to have only about 14,000 cords of spruce cut in the BWCA this winter and that a substantial part of those 14,000 cords have already been cut this winter.

Since softwood is in somewhat short supply in northern Minnesota, Northwest is interested in its sales [18] in the BWCA primarily for the softwoods they contain.

In order to help meet its requirements for softwood during 1973, Northwest plans to have about 7,200 cords cut this winter on the two sales it owns in the BWCA.[19] Northwest asserts that this wood is very important to it and that it would be injured if logging on either of its sales were enjoined, although it does admit that none of its mills would be forced to close or even to reduce operations in such event.

The softwood that Northwest plans to obtain from sales within the BWCA this winter represents approximately 5% of its requirements for softwood for 1973. It is thus clear that Northwest procures most of its softwood from sources other than its sales within the BWCA. In Minnesota, these other sources include 240,000 acres of timberland, 20 federal timber sales, 36 state timber sales and 1 county timber sale, all owned by Northwest, on which there is, in total, about 707,000 cords of merchantable softwood. In addition, Northwest had an inventory of about 30,000 cords of softwood at its mills as of December 31, 1972.

Given these figures, the Court finds that Northwest has sufficient other sources of softwood which could be cut this winter to compensate for the loss of any softwood that it planned to have cut in the BWCA this winter, due to any injunction issued by this Court. Therefore, the Court concludes that Northwest would suffer no substantial injury if timber cutting were enjoined in the BWCA pending the completion of the impact statement by the Forest Service. However, the Court does find that Northwest might be injured to the extent that it is forced to pay a somewhat higher price to obtain the remainder of the 7,200 cords of softwood it intended to procure from the BWCA.[20] This possible increase in price might be due to either the increase in transportation costs if wood must be brought in from a location farther from Northwest's mills than the BWCA or the increased costs of putting roads and other improvements into areas not planned for cutting this winter if the logger is able to pass such increased costs on to Northwest.

The Court also finds that Northwest could remedy any injury which might otherwise befall the loggers on its sales within the BWCA by providing them with other timber to cut on its own land or on the federal, state and county timber sales it owns located outside the BWCA.

*Northern Forest Products, Ltd. (Northern).* Northern is a Canadian corporation with its principal place of business at Thunder Bay, Ontario. Northern does not admit that it is doing business in Minnesota, but it has entered into contracts with Earle West, Jr. to take over the East Tofte Sale and with the St. Regis Paper Company to take over the West Tofte Sale and has subsequently entered into several agreements with the Forest Service in regard to those sales.[21]

Little evidence was introduced relating to Northern, and, in fact, no one testified directly on behalf of Northern. Mr. Fisher, the primary owner of North Shore which is Northern's logger on the Tofte Sales, did testify but his testimony related mainly to North Shore's position. Therefore, the Court is unable to make detailed findings of fact as to Northern and the nature of the injury,

---

18. The Sunnydale and Jerry Creek Sales.

19. Note that in addition to the 7,200 cords of softwood, Northwest plans to have 1,000 cords of hardwood cut on the Sunnydale Sale.

20. Timber cutting has continued as originally planned on the Jerry Creek Sale during the trial on this matter, and so a part of the 7,200 cords has already been cut. Note that Northwest did agree to suspend logging on the Sunnydale Sale for the pendency of the trial.

21. *See,* discussion in text at pages 607–609, *infra.*

if any, which would result to it if timber cutting in the BWCA were enjoined pending the completion of the impact statement by the Forest Service.

*Kainz Logging Company (Kainz).* Kainz is a partnership with its principal place of business at Ely, Minnesota. As compared to the other private defendants, Kainz is a very small entity in terms of assets, profits, number of employees, timber reserves, etc. In addition to this basic difference in size and wealth, Kainz's principal business is the production of lumber, not the production of pulp or paper. The evidence showed that the timber required for the production of lumber [22] must be larger and of a higher quality than that required for making paper.[23] The finest saw wood is red, white and Norway pine of sufficient size, while spruce and jackpine is only sometimes of saw wood size and quality.

Kainz owns no timberland itself, and so it must purchase federal, state or county timber sales which include some saw wood, although there is always some pulpwood included in such sales. Kainz cuts the saw wood itself,[24] finishes it into lumber at its sawmill in Ely, and then sells the lumber to various dealers. This process is the source of most of Kainz's revenue. Kainz also cuts the pulpwood on its sales because the timber sale contracts generally require that all merchantable timber be cut. Since Kainz has no paper mill, it sells this pulpwood to various paper companies, including some of the private defendants in this action. The Court finds that Kainz could not remain a viable entity if it were forced to rely completely or largely on the sale of pulpwood.

Kainz plans to cut about 3,400 cords of high quality saw wood and about

2,500 cords of spruce pulpwood on the Beartrap Sale this winter. In addition to the Beartrap Sale, Kainz owns six federal timber sales in the Superior National Forest outside the BWCA and two state timber sales in the general vicinity of Ely. These eight sales contain a total of about 130 cords of high quality saw wood,[25] slightly over 220 cords of lower quality saw wood and slightly less than 10,300 cords of aspen, jackpine and spruce pulpwood.

The Court finds that Kainz needs at least the 3,400 cords of saw wood it planned to cut on the Beartrap Sale this winter in order to keep its lumber operation going. Since Kainz does not have sufficient alternative supplies of saw wood to make up the loss of this 3,400 cords, the Court further finds that if Kainz is enjoined from cutting timber on the Beartrap Sale and if alternative sources of such wood are not provided to it, it will be greatly injured, and may even be forced to go out of business The Court also finds that Kainz has sufficient alternative sources of pulpwood so that the loss of the 2,500 cords of pulpwood to be cut on the Beartrap Sale this winter would not cause it substantial injury.

*Boise Cascade Corporation (Boise).* Boise is a Delaware corporation doing business in Minnesota, with its main place of business in Minnesota at International Falls. Boise owns a number of pulp and paper mills in northern Minnesota and one mill in Fort Francis, Canada, at which it employs a total of about 4,200 people. Boise will require a total supply of about 524,000 cords of wood in 1973 of which about 233,000 cords must be softwood and about 291,000 cords must be hardwood. Since softwood is in somewhat short supply in northern Minnesota, Boise is interested in its sale in

22. This type of timber is known as "saw wood."

23. This type of timber is known as "pulpwood."

24. Note that unlike the other private defendants, Kainz does its own logging.

*See,* discussion in text at pages 601 to 602, *infra.*

25. Comparable in quality to the 3,400 cords of saw wood planned for cutting this winter on the Beartrap Sale.

the BWCA [26] primarily for the softwood it contains.

In order to help meet its requirements for softwood in 1973, Boise plans to have about 1,800 cords cut this winter on the Shell Lake Sale. Boise maintains that this wood is very important to it and that it would be substantially injured if logging were enjoined on that sale, although it admits that none of its mills would be forced to close or even to reduce operations in such event.

The softwood that Boise plans to obtain from the Shell Lake Sale this winter represents less than 1% of its requirements for softwood for 1973. It is thus clear that Boise procures almost all of its softwood from sources other than its sale within the BWCA. These other sources include about 348,000 acres of timberland, 5 federal timber sales, 6 timber sales on Indian lands, 93 state timber sales, 39 county timber sales, and 11 private timber permits, all owned by Boise, on which there is, in total, about 1,401,000 cords of merchantable softwood.[27] In addition, Boise had an inventory of about 36,000 cords of softwood at its mills as of January 15, 1973.

Given these figures, the Court finds that Boise has sufficient other sources of softwood which could be cut this winter to compensate for the loss of any of the 1,800 cords of softwood, planned for cutting on the Shell Lake Sale this winter, due to any injunction issued by this Court.[28] Therefore, the Court concludes that Boise would not be greatly injured if timber cutting were enjoined in the BWCA pending the completion of the impact statement by the Forest Service. However, the Court does find that Boise might be injured to the extent that it is forced to pay a somewhat higher price to obtain the 1,800 cords of softwood it intended to get from the BWCA. This possible increase in price might be due to either the increase in transportation costs if wood must be brought in from a location farther from Boise's mills than the BWCA or the increased costs of putting roads and other improvements into areas not planned for cutting this winter if the logger is able to pass such increased costs on to Boise.

The Court also finds that Boise could remedy any injury which might otherwise befall the logger on the Shell Lake Sale by providing him with other timber to cut on its own land or on the various timber sales it owns outside the BWCA.

### Loggers

The private defendants, with the exception of Kainz Logging, do not cut the timber on their sales, but instead contract the cutting out to independent contractors, referred to as "loggers." The logger generally enters into a contract with a paper company to purchase the stumpage [29] for about the same price as the paper company purchased it from the Forest Service. The evidence showed that this price is generally in the range of $1.50 to $5.00 a cord. The logger then prepares the sale area for cutting by building roads, setting up a camp, etc., cuts the timber or subcontracts the cutting to another logger and hauls it himself or has another independent contractor haul it to the paper company's mill or to a railhead from where it will be shipped to the mill. The evidence showed that the loggers are generally paid from $20.00 to $30.00 a cord at the point of delivery. The loggers, their employees, haulers and sub-

26. Boise now owns the Shell Lake Sale. *See*, note 12, *supra*.

27. Note that about 52,000 of the 348,000 acres of timberland owned by Boise in Minnesota are located on the Kabetogama Peninsula which is to become part of the proposed Voyageurs National Park. Although Boise still has a legal right to cut timber on that Peninsula, it has agreed not to do so pending the creation of the Park. Thus about 188,000 cords of Boise's total of 1,401,000 cords of softwood is not really available to it for cutting.

28. Note that Boise agreed to suspend logging on the Shell Lake Sale for the pendency of the trial on this matter, and so none of this 1,800 cords has been cut.

29. Stumpage refers to the trees actually sold in a timber sale.

contractors make their living out of the $15.00 to $28.50 a cord difference in price.

While none of the loggers are parties to this action, they are discussed in order to give a full picture of the local economy as it bears on the public interest. Following is a list of the loggers involved in the active sales in the BWCA:

1. *Clarence Olson.* Mr. Olson resides in Orr, Minnesota, owns $50,000 worth of equipment and is a logger for Boise on various federal and state timber sales it owns. He logged the Shell Lake Sale for Boise last winter with 11 employees, and was planning to employ about the same number this year in logging the remaining 1,900 cords of timber on that sale. Mr. Olson did not start cutting as planned because Boise agreed not to allow logging on this sale pending the Court's decision.

When Mr. Olson found out that he could not cut timber on the Shell Lake Sale for the time being, he and 7 employees began logging the Marion Bluffs Sale, a federal timber sale in the Superior National Forest outside the BWCA. The Marion Bluffs Sale contains mostly summer wood [30] which Mr. Olson logged from May to December in 1972 with from 5 to 6 employees. About 7,800 cords of various species, but mostly aspen, remain on the Marion Bluffs Sale, and Mr. Olson believes that even if he logged that sale for the rest of the winter he would be able to continue logging it next summer. Therefore, the Court finds that Mr. Olson would not be greatly injured by an injunction proscribing logging in the BWCA pending the Forest Service's new BWCA Management Plan and accompanying impact statement.

2. *Art Nelson.* Mr. Nelson resides in Togo, Minnesota, owns about $150,000 worth of equipment and does most of his logging for Northwest, either on his own land or on federal or state sales owned by Northwest. He was planning to cut about 4,200 cords of timber on 200 acres on the Sunnydale Sale this winter, but did not begin to do so after Northwest agreed to discontinue logging on this sale pending the Court's decision. Mr. Nelson employed about 15 people last winter when he was logging on the part of the Sunnydale Sale that lies outside the BWCA and about the same number last summer, but was forced to lay off 11 employees when logging was discontinued on the Sunnydale Sale.

He and his remaining 4 employees are now logging the Hunting Shack Sale, a federal timber sale in the Superior National Forest outside the BWCA owned by Northwest. The Hunting Shack Sale has about 4,800 cords of softwood remaining, but this is summer wood and Mr. Nelson testified that he would have little timber to cut this summer if he finished that sale this winter unless he could purchase a new federal, state or county timber sale, or obtain the cutting rights for other stumpage owned by Northwest. In addition to the Hunting Shack Sale, Mr. Nelson has a small amount of timber (about 500 cords) to cut on a federal timber sale he owns located in the Superior National Forest outside the BWCA, and on land he owns near Side Lake. The Court finds that Mr. Nelson will not be greatly injured by the injunction sought by plaintiff until this summer and that he will not be injured even then unless Northwest is unwilling to provide him with other timber to cut or if he is not able to purchase any other federal, state or county timber sales.

3. *Oscar Bergstrom.* Mr. Bergstrom did not testify during the trial, and little evidence was introduced as to his position. John Cedergren, an employee of Northwest, did testify that Mr. Bergstrom only started logging the Jerry Creek Sale this winter when the former logger suddenly retired. He also testi-

---

**30.** Summer wood is a logging term that refers to timber that is on high ground (as opposed to in or near a swamp) and, thus, which can be cut during the summer.

fied that Mr. Bergstrom has sufficient timber which could be cut this winter so that he would not be greatly injured if logging on the Jerry Creek Sale was enjoined.

*4. Leustek & Sons, Inc.* (hereinafter referred to as Leustek) This corporation is principally owned by various members of the Leustek family and has its main place of business in Ely, Minnesota. It had its beginnings in the early 1940's and it logged for the now defunct Tomahawk Timber Company on the old Tomahawk Sale from 1945 to 1965. In 1965 it started logging for Consolidated on the remnants of the Tomahawk Sale which include the present East Road Block, Compartment 38 Block and Trail Block Sales. Leustek is also Consolidated's logger on the Old Road Sale. Leustek is the largest logging concern in Minnesota, owning about $1,000,000 worth of equipment and employing approximately 70 people. Leustek entered into a 5 year contract with Consolidated which is still in force and which provides that Consolidated must provide it with at least 10,000 cords of timber a year to cut. This contract allowed Leustek to invest in about $250,000 worth of new equipment. This winter, Leustek plans to finish logging the East Road Block Sale, the Compartment 38 Block Sale and the Trail Block Sale if possible. It does not plan to log the Old Road Sale this winter.

In addition to its logging for Consolidated, Leustek also logs about 10,000 cords of timber a year for the Mosinee Paper Mill and owns four federal timber sales in the Superior National Forest outside of the BWCA, with a total of about 5,300 cords of timber. Leustek believes that it would have to lay off

many of its employees if logging on Consolidated's sales within the BWCA was enjoined, but, in any event, that this will occur after this winter because of the shortage and/or high cost of timber in St. Louis and Lake Counties. The Court finds that this belief is well founded unless Consolidated makes more timber available for it to cut or it is able to purchase any other federal, state or county timber sales.

*5. North Shore Forest Products.* (hereinafter referred to as North Shore) This is an entity which is largely owned by Harry Fisher and is located in Grand Marais, Minnesota. North Shore has logged for Northern, mainly on the Tofte Sales, since 1966. It owns about $125,000 worth of equipment, and has invested about $250,000 in logging roads on the Tofte Sales. North Shore employs 18 people full time, a few others part time and 5 haulers on the East Tofte Sale, and 3 subcontractors who have 6 employees and 2 haulers on the West Tofte Sale. Mr. Fisher testified that North Shore planned to cut about 4,000 cords of timber on the East Tofte Sale and about 3,000 cords on the West Tofte Sale this winter.

In addition to the East and West Tofte Sales, North Shore owns, or owns the cutting rights on, 4 federal timber sales in the Superior National Forest outside the BWCA and 2 state timber sales, with a total of about 8,000 cords of spruce and jackpine.[31] In spite of these other sales, Mr. Fisher believes that North Shore would have to lay off many employees and that his subcontractors and haulers would have to do the same if logging on the Tofte Sales was enjoined. However, the Court finds that while North Shore might suffer some fi-

---

**31.** One of these federal timber sales, the Old Dump Sale, is presently being cut by North Shore and the wood from this sale is going to Northern while the spruce from the Tofte Sales is going to Consolidated which owns the Old Dump Sale. This timber "swap" is being carried out to save both Northern and Consolidated shipping costs since the Old Dump Sale is closer

to Northern's mills and the Tofte Sales are closer to Consolidated's mills, but would probably be discontinued if Northern were enjoined from allowing timber to be cut on the Tofte Sales. The timber from the Old Dump Sale would then still be cut by North Shore but would go to Consolidated.

nancial loss from such an injunction, no employees would have to be laid off because North Shore has sufficient alternative supplies of timber to make up for that lost.[32]

*6. Raymond Hahn.* Mr. Hahn resides in Schroder, Minnesota and has logged for Consolidated for about 9 years. He owns about $250,000 worth of equipment for his logging operation and states that he must cut at least 10,000 cords of wood a year to make staying in business worthwhile. In addition, he manufactures and markets a tree harvesting machine that he invented, the "Hahn Harvester." Mr. Hahn is presently logging the Black Spruce Sale and plans to finish it this winter by cutting the final 2,700 cords of timber. He employs 5 people on the sale and has hired a hauler who employs 4 people to truck out the wood. Mr. Hahn also employs 6 people in the production of the Hahn Harvester.

In addition to being the logger on the Black Spruce Sale, Mr. Hahn owns the Cascade Sale in the Superior National Forest outside the BWCA and has a subcontract to cut a state sale. Together these two sales total a little over 1,375 cords of various species. Mr. Hahn believes that he would have to lay off most of his employees if logging on the Black Spruce Sale was enjoined, but that, in any event, he will have to lay off some employees in the future because of the shortage of merchantable timber in Cook County. The Court finds that this belief is well founded unless Consolidated makes more timber available to Mr. Hahn to cut or he is able to purchase other federal, state or county timber sales.

---

32. In addition to the 8,000 cords of spruce and jack pine referred to, note that North Shore has already logged a substantial portion of the 17,000 cords planned winter cut on the Tofte Sales.

33. The Staff Forester indicated that these sales which were not bid on would be offered again if interest was shown in them.

34. It should be noted that there is a $15,-000 limit (M.S.A. § 90.01, Subd. 1) on the

*State Timber Sales*

In addition to the timber resources owned by the private defendants and loggers, there is timber available for cutting on state owned property that is located near the BWCA. The Staff Forester for Timber Sales for the State of Minnesota testified that since 1970, the state has put up 190 timber sales that have not yet been bid on. In the period from July 1, 1971 to June 30, 1972, the allowable cut on state owned lands in Cook, Lake and St. Louis counties was well over 10,000 acres, including both hardwood and softwood timber. However, the area actually cut in this period was only about 5,000 acres. The results for the preceding fiscal year were similar, leaving thousands of acres of available timber uncut. Of course, there may be particular reasons as to why a given sale was not bid on, but the unmistakable conclusion to be drawn is that there are ample alternate sources of timber available outside of the BWCA which could have been or could now [33] be purchased by the private defendants or loggers.[34]

*Active Timber Sales in the BWCA*

There are eleven active sales within the BWCA which are in controversy in the present action. Following is a list of these sales, including a brief description of each and an indication of any federal actions in regard thereto taken after January 1, 1970, the effective date of NEPA:

*1. Shell Lake Sale.* This sale is located on the southwestern edge of the BWCA just to the west of the Sunnydale Sale and to the south of Shell Lake. It

price of state timber sales, and that most are priced at under $10,000. Because of this limit, the timber sales tend to be small in area and therefore are often not attractive to the larger private defendants and loggers when larger sales in the same general area are available. However, the evidence showed that some of them have purchased such sales in the past.

is adjacent to primarily virgin forest areas as well as some areas which have been previously logged and, if logged, would be a direct incursion into one of the main virgin forest areas of the BWCA. The Shell Lake Sale was purchased by Emil Abramson on September 24, 1968, and involved 5,494 cords of wood on 510 acres of which 2,844 cords on 265 acres remained uncut as of June 30, 1972. In an instrument dated July 21, 1971, Abramson designated Boise as his authorized representative for the sale. Clarence Olson, the logger on the sale, plans to finish logging it this winter. The original termination date of the sale was June 30, 1972, a date which was, in later documents, assumed to be July 31, 1972. On the latter date, the Forest Service granted Mr. Abramson a waiver of time limit (i. e., an interim extension) until September 20, 1972 to allow additional time for execution of an extension agreement. In an agreement dated September 21, 1972, the termination date was extended to June 30, 1973. An "environmental analysis," [35] was prepared for this extension. The sale contract was modified on October 22, 1971 by a change in the provision relating to consumer scaling. The sale contract was further modified on September 21, 1972, in conjunction with the extension granted on that date, by the addition of various new provisions. 3.5 miles of road have already been constructed on this sale, and an additional 1 mile must be built in order to finish logging it.

  2. *Sunnydale Sale*. This sale is located on the southwestern edge of the BWCA just to the northwest of Ramshead Lake. It is almost entirely surrounded by virgin forest and, if logged, would be a direct incursion into one of the main virgin forest areas of the BWCA. Part of this sale was burned over in the Little Sioux Fire which occurred in May, 1971. There is much scientific research going on in the burn area on numerous plots which have been set up to study the regeneration of various eco-systems (communities of different species) after a forest fire. Art Nelson, the logger on this sale, plans to cut about 4,200 cords of timber on 200 acres this winter near the western boundary of the sale to the south of Dogfish Lake and within a short distance from the edge of the burn and the research plots referred to above. Many of these research plots might be adversely affected by such cutting. Other studies in this area dealing with the effect of burned areas on deer, moose and timber wolves would also be adversely affected by the logging planned for this winter because it would eliminate some of the animals' cover.[36] The Sunnydale Sale was purchased by Northwest on March 28, 1968, and involved 48,852 cords of wood on 2,014 acres of which 20,153 cords on 1,463 acres remained uncut as of June 30, 1972. The termination date of the sale is June 30, 1978, and the Forest Service expects logging on it to be completed by the termination date. On September 25, 1972, the sale contract was modified by the deletion of 1,068 acres which is the area in the sale that was actually burned. This was done at the request of the North Central Forest Experiment Station (hereinafter referred to as NCFES), members of which are carrying on experiments in the burned area. 4.5 miles of road have already been constructed on this sale, and an additional 9.5 miles must be built in order to finish logging it. The location of the roads which must still be constructed have been agreed to by the Forest Service and NCFES.

---

35. "Environmental analyses" are not and are not intended to be the more lengthy and complete "environmental impact statements" required by NEPA in certain circumstances, but are merely meant to briefly lay out the various environmental factors taken into consideration in granting an extension.

36. The deer and moose feed on the young growth in the burn area, but seek cover from the elements in the softwood forest areas nearby. Some of these softwood forest areas are the areas which are to be cut this winter.

*3. Jerry Creek Sale.* This sale is located on the southwestern edge of the BWCA just to the southeast of the Sunnydale Sale and to the southwest of White Feather Lake. It is almost entirely surrounded by virgin forest area and, if logged, would be a direct incursion into one of the main virgin forest areas of the BWCA. The Jerry Creek Sale was purchased by Northwest on April 7, 1965 and involved 18,906 cords of wood on 1,307 acres of which 11,340 cords on 784 acres remained uncut as of June 30, 1972. Oscar Bergstrom the logger on this sale, plans to cut in the northern part of the sale this winter—i. e., the part of the sale adjacent to virgin forest. The original termination date was March 20, 1969, but this was extended as of that date to March 31, 1971 in an undated agreement between the Forest Service and Northwest. On March 17, 1971, the Forest Service granted Northwest a waiver of time limit (i. e., an interim extension) until May 31, 1971 to allow additional time for execution of an extension agreement, and such an agreement was entered into on April 15, 1971 in which the termination date was extended to March 31, 1974. No "environmental analysis," as defined in note 35, *supra*, was prepared by the Forest Service for the latter extension. The Forest Service now expects logging on this sale to be complete by the new termination date. 1.7 miles of road have already been constructed on this sale and an additional 3 miles of road must be built in order to finish logging it.

*4. Beartrap Sale.* This sale is located on the southwestern edge of the BWCA just to the northwest of the Old Road Sale and Home Lake. It is adjacent to some virgin forest areas as well as some areas logged since 1940. If this sale is completely logged, it would be a direct incursion into one of the main virgin forest areas of the BWCA. The Beartrap Sale was purchased by Kainz on December 30, 1968 and involved 12,600 cords of wood on 934 acres of which 8,068 cords on 500 acres remained uncut as of June 30, 1972. Kainz is logging this sale itself and intends to cut in the northeastern section this winter—i. e., in the part of the sale adjacent to virgin forest. The termination date of the sale is December 31, 1973, and the Forest Service feels that it is possible that the logging will be complete by that date. The sale contract was modified in February 1972 by the addition of a revised sale area map, and by new provisions regarding designation for cutting, the cutting schedule and payment units. Five miles of road have already been constructed on this sale, and an additional 1.8 miles must be built in order to finish logging it.

*5. Old Road Sale.* This sale is located on the southwestern edge of the BWCA to the southeast of Home Lake. It is adjacent to some virgin forest areas as well as some areas logged previously. The Old Road Sale was purchased by Consolidated on July 26, 1966, and involved 12,100 cords of wood on 1,261 acres of which 5,172 cords on 291 acres remained uncut as of June 30, 1972. Leustek, the logger on the sale, plans no logging on it this winter. The original termination date was June 30, 1971, but this was extended as of that date to June 30, 1973, in an undated agreement between the Forest Service and Consolidated. No "environmental analysis," as defined in note 35, supra, was prepared for this extension. The Forest Service now believes that logging will not be complete on this sale by the new termination date. In July, 1972, in conjunction with the extension granted at about that time, this sale was modified by the deletion of 420 acres of uncut timber on areas with thin soil and many rock outcroppings, and the addition of many new provisions to the original sale contract. Five miles of road have already been constructed on this sale and an additional 3.5 miles must be built in order to finish logging it.

*6. Trail Block Sale.* This sale is located on the southcentral edge of the BWCA just to the south of the Isabella

River and Rice Lake. It is adjacent to some virgin forest areas as well as some areas logged since 1940, but there is a large area, logged since 1940, between the sale and the main virgin forest areas of the BWCA. The Trail Block Sale was purchased by Consolidated on March 3, 1969, and involved 11,100 cords of wood on 1,143 acres of which 2,164 cords on 300 acres remained uncut as of June 30, 1972. The termination date of the sale is March 31, 1973, and Leustek, the logger on the sale, plans to finish logging it by that date if possible. Spruce budworm, an insect which really attacks the balsam fir, has destroyed 640 acres out of the 1,140 acres of balsam fir which was to be logged on the sale and would destroy more if the sale is not fully logged this winter. Nine miles of road have already been constructed on this sale, and an additional 2 miles must be built in order to finish logging it.

7. *Compartment 38 Block Sale.* This sale is located on the southcentral edge of the BWCA to the southwest of the East Road Block Sale and Perent Lake. It is adjacent to some virgin forest areas as well as some areas logged since 1940, but there is a large area, logged since 1940, which is between the sale and the main virgin forest areas of the BWCA. The Compartment 38 Block Sale was purchased by Consolidated on January 16, 1968, and involved 4,930 cords of wood on 742 acres of which none had been cut as of June 30, 1972. The termination date of the sale is March 31, 1973, and Leustek, the logger on the sale, plans to finish logging it by that date. Six miles of road have already been constructed on this sale, and an additional 1.5 miles must be built in order to finish logging it.

8. *East Road Block Sale.* This sale is located on the southcentral edge of the BWCA to the north of the Compartment 38 Block Sale and the northeast of Perent Lake. It is adjacent to some virgin forest areas as well as some areas logged since 1940, but there is a large area, logged since 1940, which is between the sale and the main virgin forest areas of the BWCA. The East Road Block Sale was purchased by Consolidated on January 3, 1967, and involved 14,183 cords of wood on 1,656 acres of which 2,148 cords on 100 acres remained uncut as of June 30, 1972. Leustek, the logger on this sale, plans to finish logging it this winter. The original termination date was December 30, 1971, but, on December 7, 1971, the Forest Service granted Consolidated a waiver of time limit (i. e., an interim extension) until January 31, 1972 to allow additional time for execution of an extension agreement. In an agreement dated January 5, 1972, the termination date was extended to June 30, 1972. An "environmental analysis," as defined in note 35, *supra*, was prepared for this extension. The sale contract was modified on January 5, 1972, in conjunction with the extension granted on that date, by the addition of new provisions dealing with scaling, contract term adjustment and non-discrimination in employment. The sale contract was further modified, apparently by oral agreement, by the deletion of 200 acres of uncut spruce fir and black spruce that was under age and immature. Sixteen miles of road have already been constructed on this sale, and an additional 3.5 miles must be built in order to finish logging it.

9. *West Tofte Sale.* This sale is located in the southeastern edge of the BWCA to the west of Alton Lake. It is surrounded by virgin forest on the north, the East Tofte Sale on the east and an area logged after 1940 to the south. A substantial part of this sale is to be included in the 1975 addition to the Interior Zone, but these areas have not yet been formally deleted from the sale. However, a "good share" of the areas to be included in the 1975 addition to the Interior Zone are located east of the Lujenida Portage, and the Forest Service and Northern have an informal understanding that no logging will be done in that area. These informal understandings are not legally binding, but are generally adhered to. The sale has

been inactive for several years, but is being logged this winter. The area which is planned for logging this winter is a strip running from the northern end of Alton Lake to the northern boundary of the sale just to the west of the reserve strip around Lujenida Lake and the Lujenida Portage. If logged, this area would represent a direct incursion into one of the main virgin forest areas of the BWCA. The West Tofte Sale was purchased by the St. Regis Paper Co. on July 13, 1959, and involved 139,310 cords of wood on 12,025 acres of which 96,347 cords on 5,000 acres remained uncut as of June 30, 1972. The sale was taken over by Northern with the approval of the Forest Service on August 15, 1969. Since that date, the logger on the sale has been North Shore. The original termination date of the sale was August 15, 1969, but this was extended as of that date to June 30, 1974. The sales contract was also modified at the time of this extension by the deletion of 3,320 acres which are to be included in the 1975 addition to the Interior Zone to prevent the construction of logging roads east of the Lujenida Portage. The Forest Service does not expect logging on this sale to be complete by the new termination date. Ten miles of road have already been constructed on this sale, and an additional 10 miles of road must be built in order to finish logging it.

10. *East Tofte Sale*. This sale is located in the southeastern portion of the BWCA to the southwest of Brule Lake. It is surrounded by virgin forest to the north, the Black Spruce Sale to the east, an area logged after 1940 to the south, and the West Tofte Sale to the west. Part of the uncut portion of this sale is within the area of the 1975 addition to the Interior Zone, but this area will not be deleted from the sale since it is part of an area, also to be included in the 1975 addition to the Interior Zone, which has already been cut. The area which is planned for logging this winter is in the northern part of the sale and, if logged, would be a direct incursion

into one of the main virgin forest areas of the BWCA. The East Tofte Sale was purchased by Earle West, Jr. on November 20, 1961, and involved 93,980 cords of wood on 6,940 acres of which 15,000 cords on 900 acres remained uncut as of June 30, 1972. The sale was taken over by Northern with the approval of the Forest Service on October 7, 1965. Since that date, the logger on the sale has been North Shore. The original termination date of the sale was March 20, 1972, but, on March 7, 1972, the Forest Service granted Northern a waiver of time limit (i. e., an interim extension) until April 15, 1972 to allow additional time for execution of an extension agreement. In an agreement also dated March 7, 1972, the termination date was extended to June 30, 1974. An "environmental analysis," as defined in note 35, *supra,* was prepared by the Forest Service for this extension. The Forest Service now expects logging on this sale to be complete by the new termination date. The sale contract was modified on October 29, 1970 by a change in the rates of payment and in the construction standards and specifications for logging roads. The sale contract was again modified on April 23, 1971 by the deletion of 345 acres which are along canoe routes, are in areas characterized by shallow soil and rock outcroppings and are to be included in the 1975 addition to the Interior Zone. The sale contract was further modified on March 7, 1972, in conjunction with the extension granted on that date, by the deletion of an additional 2,059 acres, the addition of reserved areas around several ponds, and a change in the period during which internal combustion engines cannot be used in the sale area. Eleven miles of road have already been constructed on this sale, and an additional 1.75 miles of road must be built in order to finish logging it.

11. *Black Spruce Sale*. This sale is located in the southeast portion of the BWCA to the south of Brule Lake. It is surrounded by areas logged before 1940 to the north and east, a small virgin for-

est to the south and the East Tofte Sale to the west. Part of the adjacent areas mentioned above are to be included in the 1975 addition to the Interior Zone. The Black Spruce Sale was purchased by Consolidated on December 22, 1969 and involved 5,440 cords of wood on 729 acres of which 2,700 cords on 430 acres remained uncut as of June 30, 1972. Raymond Hahn, the logger on the sale, plans to finish logging it this winter. The original termination date of the sale was December 31, 1972, but this was extended on November 7, 1972 to June 30, 1973. No "environmental analysis," as defined in note 35, *supra*, was prepared for this extension because of the short term involved. The sale contract is in the process of being modified by the deletion of 40 acres which are included in the 1975 addition to the Interior Zone. 1.8 miles of road have already been constructed on this sale, and an additional 1.7 miles must be built in order to finish logging it.

In addition to the specific actions taken by the Forest Service in regard to the eleven contracts in controversy, enumerated above, the Forest Service periodically entered into certain standardized agreements with the purchasers of the sales, and gave them certain standardized authorizations. These agreements and authorizations include agreements to remove timber and/or accept consumer scale, releases of timber for cutting after payment was received, changes in rates to be paid for timber and agreements on the optional cutting of aspen, birch, etc. including the rates to be paid for such timber.

Agreements to remove timber and/or accept consumer payment were entered into on the following sales after January 1, 1970: Trail Block, Black Spruce, East Road Block, Compartment 38 Block, Old Road, Beartrap and Shell Lake.

Releases of timber for cutting were granted on the following sales after Jan-

uary 1, 1970: Beartrap, Sunnydale and Jerry Creek.

Changes in the rates to be paid for timber were made on the following sales after January 1, 1970: Trail Block, East Tofte, Compartment 38 Block and Beartrap.

Finally, agreements on the optional cutting of aspen, birch, etc. were entered into on the following sales after January 1, 1970: West Tofte, Sunnydale and Shell Lake.

The evidence indicates that the Forest Service has also taken numerous more informal [37] actions in the administration of these sales since January 1, 1970, pursuant to §§ 330-338 of the BWCA Management Handbook. Some examples of such action are: approval of work to be done on or near the Shipstead-Newton-Nolan Act reserved strips, approval of the location of temporary logging roads especially where streams, portages or trails must be crossed, approval of the use of gravel on such roads, marking of the sale area boundaries on the ground, approval of special use of internal combustion engines on haul roads in the summer, approval of the layout, sanitary facilities and buildings for logging camps, approval of the new types of logging equipment, approval of the cleanup on various improvements after use is finished, inspections of the sales on a yearly basis by the District Ranger and on a more frequent basis by the District Timber Manager, and general supervision of the sale by the District Ranger.

*Effects of Logging on the BWCA*

The effect of logging on the BWCA cannot be fully understood without some idea of the ecological history of the BWCA and the nature of the various plant species found there. The BWCA is what might be termed a boreal-transition forest with boreal forests to the north and the Great Lakes-St. Lawrence forests to the south. The boreal or

37. These actions are described as informal because they are seldom in writing and are often taken at a lower level (by the District Ranger) than the actions described in more detail *supra*.

northern forests are comprised largely of jackpine, tamarack, black and white spruce, balsam, cedar, aspen and birch with the softwoods in the majority, while the Great Lakes-St. Lawrence forests are comprised largely of aspen, birch, maple, various other hardwoods, red and white pine and hemlock with the hardwoods in the majority. The BWCA contains all the species mentioned above, but the main forest type found in the virgin forest areas is a combination of jackpine and aspen with black spruce in the swampy areas.[38]

The evidence at trial clearly showed, and the Court finds, that this type of forest is dependent on periodic forest fires for its existence and reproduction and has been so for at least 5,000 years. Over the centuries, forest fires have swept through various portions of the BWCA, destroying the old, decaying forest and regenerating a new forest to take its place. In addition to destroying the old forest, a wild forest fire [39] or a prescribed fire in standing timber prepares the area burned for regeneration by reducing the crown,[40] releasing the nutrients contained in the vegetation burned,[41] reducing the duff which covers the soil [42] and initiating the various species' reproductive processes.[43] Thus, a forest fire has the effect of recycling the entire natural eco-system in the area burned. After the fire, the smaller plants, herbs, grasses and bushes appear as well as the seedlings of the trees which will grow into a forest, and another ecological cycle is under way.

The dependence of the type of forest found in the BWCA on forest fires is due in large part to the reproductive process of the jackpine. The jackpine's cones will open and allow dispersal of its seeds only if subjected to the intense heat of a fire. This means that jackpine cannot reproduce without some type of fire unless planted or seeded by man. Unlike jackpine, aspen reproduces itself by sending up suckers from the existing root system whenever it is killed, whether by logging, fire, disease or some other cause. Therefore, if a jackpine-aspen forest is logged, it will reproduce an aspen forest unless some affirmative action, like prescribed burning of slash, planting of jackpine seedlings, or seeding of jackpine, is taken.[44] However, even if a jackpine-aspen forest is reproduced by man after logging, it does not follow that such a forest retains its primitive character.[45]

After hearing and considering all the evidence the Court must conclude that once an area has been logged, it cannot be fully returned to its natural state, although if the proper methods of reforestation are used that result can be approximated to the untrained eye. An area that has been logged by any presently known method cannot be fully returned to its natural state for three reasons. The first reason is that the nutrients in the wood actually removed

38. It is difficult to make generalizations on the type of forest found in the BWCA since different areas have different specie mixes.

39. A forest fire which has a natural origin, such as lightning.

40. The crown, or canopy, is the foliage in the tops of the trees which shades the forest floor. The crown must be reduced in order for jackpine to grow since they require full or nearly full sunlight.

41. These nutrients are contained in the ash which falls to the forest floor and they enter the soil when it rains.

42. The duff is the organic matter on the forest floor, often 6–7 inches deep, which is at least partially burned by a forest

fire. The duff must be reduced so that jackpine seeds can root since they cannot do so through too thick a layer of duff. Aspen suckers can grow through the duff.

43. That is, the heat of the fire will open the jackpine's ones and will kill the aspen trees.

44. Note that the black spruce in the swamps regenerates itself from seeds from nearby trees if cut in strips or if patches of seed trees are left after logging.

45. The Wilderness Act, 16 U.S.C. § 1133 (d)(5) requires that the primitive character of the BWCA be maintained. For the exact language of the statute, see, pages 592–593, supra.

from the forest during the logging process are lost. The result is that new growth in the area logged is usually not as lush or luxuriant as the old growth. The evidence showed that about 40% of a tree's total nutrients are lost in this manner while 60% remains in the slash [46] which is usually left in the logged area. Depending on how the slash is disposed of, the nutrients it contains may be returned to the soil immediately over some period of time, and they may be dispersed over the entire area logged or concentrated in one spot.[47] Once logging has occurred, the best method of disposing of the slash, from the standpoint of obtaining the most natural result, is to spread it over the entire area logged and burn it.

The second reason is that the tree stumps left by the logging process remain as an indication that logging occurred in the area until they finally rot up to 50 to 100 years later. However, the time during which these stumps will remain noticeable may vary depending on the method of site preparation used, if any.[47(a)]

The third reason is that the effects of the logging roads and other improvements required for logging are extremely long lasting and may remain visible for many years after logging is finished. The length of time that the effects of these things will last and remain visible depends on the effort made to eradicate

them after logging is complete. The evidence showed that logging roads and skid trails from logging taking place in the early 1900's were still clearly visible in aerial photographs taken during the 1940's, and that the main logging roads from that era are still visible in aerial photographs today. The evidence showed that logging roads of more recent origin are clearly visible after 20 to 30 years if nothing is done to eradicate them or after 15 to 20 years even if efforts are made to eradicate them. The variations in the times noted above are due to the fact that the road building techniques vary from winter roads [48] to gravel-surfaced roads. Furthermore, the effects of logging roads may last many years after they cease to be clearly visible to the average person. For instance, the erosion of logging roads on hilly terrain is noticeable long after the road itself ceases to be visible. Another example is the continued existence of exotic [49] grasses and plants which are often planted along or on logging roads to reduce erosion or to eradicate them.

Although it is clear that a logged area cannot be returned to a completely natural state, this result can be approximated by certain reforestation techniques. However, it is also true that other reforestation techniques actually aggravate the effects of logging on the area involved so that such logging may be evident for thousands of years.

---

46. Slash refers to the tree tops and branches that are the debris of the logging process.

47. If the slash is spread out over the logged area and burned, the nutrients will be returned to the soil immediately and are well dispersed. If the slash is piled up and burned, the nutrients are returned to the soil immediately but are concentrated in one spot. If the slash is spread out over the logged area and left to rot, the nutrients are returned to the soil over a period of time, but are well dispersed. If the slash is piled up and left to rot, the nutrients are returned to the soil over a long period of time, and are concentrated in one spot.

47(a). Site preparation techniques are discussed at pages 614–617, *infra.*

48. Winter roads are constructed in the winter after the ground freezes by first logging the road area and then driving heavy equipment over the "road" to pack down the snow, thus "freezing the road down" so that it will bear the weight of loaded trucks. These roads leave a less lasting impression than the normal dirt or gravel road because the ground itself is not disturbed. However, since the road area is logged while areas adjoining it may not be, such roads are noticeable for many years.

49. Exotic means species which are not natural to the locality, being imported from other areas.

Reforestation is the responsibility of the Forest Service, but it is largely financed by the price paid by the purchasers of timber sales. The timber sale-reforestation process is meant to be a self-sustaining venture, although the evidence showed that the prices paid by timber sale purchasers do not provide the Forest Service with sufficient funds to use the most effective reforestation techniques, or, as a matter of fact, any reforestation technique at all in some cases.[49(a)] For instance, the evidence showed that, in recent years, for timber sales in the BWCA, the average price of a cord of spruce is $3.20 or $48.00 an acre, and of a cord of jackpine is $1.50 or $22.50 an acre,[50] while the cost of reforestation varies between $10.50 and $97.-50 an acre.

The $10.50 figure represents what the Forest Service refers to as "natural regeneration." "Natural regeneration" will be discussed in detail, *infra*, but can be briefly described as doing nothing. The $10.50 cost per acre is the pro rata share of the administration cost of all the timber sales in the BWCA. The $97.50 figure represents seedling plant-ing after some kind of site preparation.[51] That figure includes the $10.50 per acre share of the administration costs, an average of $31.00 an acre for site preparation, $21.00 per acre for seedlings and $32.00 an acre for the actual planting. The most common costs of reforestation between the two figures given above are $63.50 an acre for seedling planting with no site preparation, $41.50 an acre for "natural regeneration" after site preparation,[52] and $40.50 an acre for seeding after site preparation.[53] There was no direct evidence as to the total fees collected on timber sales as compared to the total cost of reforestation, but these figures can be estimated from the facts discussed above and from various Forest Service documents in evidence. In 1972, when about 9,650 acres of timber were cut and about 11,400 acres were reforested,[54] the total cost of reforestation was about $540,000[55] while the timber sale purchasers paid between about $217,000 and $463,000 for the wood they cut.[56] The latter two figures vary so much because the former is based on the average price of jackpine (the lowest priced softwood specie) and

---

49(a). The latter refers to "natural regenera-tion" which is discussed at page 614, *infra.*

50. The evidence at trial was that, on the average, there was about 15 cords of wood per acre in the BWCA. The average prices were obtained from plaintiff's exhibit 70 which contains figures furnished by the Forest Service.

51. Site preparation is a general term used to refer to all the various methods of preparing the ground to receive seedlings or seeds. These various methods, some of which will be discussed in detail, *infra,* include the following: rock raking, spot scarification, strip scarification, chaining, the use of hand tools, prescribed burning, other mechanical preparation, and chemical preparation (herbicides).

52. These site preparation techniques are chaining and the use of hand tools. *See,* page 616, *infra.*

53. The cost of seeding, including the cost of the seed, is about $9.00 an acre.

54. The latter figure includes about 4,000 acres which were left to "natural regen-eration." *See,* plaintiff's exhibit 71, a document prepared by the Forest Service.

55. This figure was arrived at from plaintiff's exhibit 71 as follows:
1. The administrative cost for the logging of about 9,650 acres at $10.50 an acre is about $101,325.00.
2. The site preparation cost for about 5,585 acres at $31.00 an acre is about $173,135.00.
3. The cost of seedlings to plant on 4,-510 acres at $21.00 an acre is $94,710.-00.
4. The cost of planting the seedlings on the 4,510 acres at $32.00 an acre is $144,320.00.
5. The cost of seeding about 2,890 acres at $9.00 an acre is about $26,000.00.
The total of these costs is about $540,-000.00.

56. These figures are for the entire Superior National Forest including the BWCA. The figures for just the BWCA would be about 30% of those given, but would be in about the same ratio.

the latter is based on the average price of spruce (the highest priced softwood specie). The actual figure is obviously between $217,000 and $463,000, but it is relatively unimportant since the significant fact is that the purchases of timber sales in the BWCA are clearly inadequate to finance the Forest Service's reforestation process, even when over one-third of the area to be reforested is left to "natural regeneration." [57]

The Forest Service employs three basic methods of reforestation: planting seedlings, "natural regeneration" and seeding after site preparation. Seedling planting is used about 40% of the time, "natural regeneration" about 35% and seeding about 25%.[58] In addition, there was testimony on another method of reforestation which the Forest Service has used only experimentally in the BWCA. This involves the prescribed burning of slash spread evenly over the logged area with a certain number of jackpines left standing in the area burned to serve as seed sources.[59]

Seedling planting is done entirely by hand using a mattock or grub hoe.[60] It may be done without any site preparation[61] or after some method of site preparation—usually rock raking, strip scarification or spot scarification—has taken place.[62] The seedlings planted in a given area are generally all of the same specie. The present Forest Service practice is to plant, or have planted,[63] about 700 seedlings per acre, the seedlings are spaced about 8 feet apart on all sides, but not so precisely spaced as to be in rows.

Although seedling planting is an effective artificial method of reforestation, it does have sufficient unnatural aspects so that the primitive character of the area so planted is destroyed. The chief unnatural aspect of seedling planting is that it results in an area almost completely populated by one specie and by trees of the same age, while the "typical" type of forest found in the virgin forest areas of the BWCA contains mixed species and tree ages with different mixtures found in different areas. Another such aspect is the relatively even spacing of the trees resulting from seedling planting which is unlike random spacing in virgin forest areas. A further unnatural aspect is the great difference in the density of a forest reforested by planting seedlings and a forest regenerated after a forest fire in standing virgin timber. The latter, at least in the first few years after the fire, may have an average of from 12,000 to 20,000 seedlings per acre as compared to the 700 seedlings per acre generally planted by or at the direction of the Forest Service. However, in the naturally regenerated forest, trees die off as time passes due to over-crowding, until at maturity [63(a)] or slightly over-

57. See, note 54, supra.

58. The percentages were derived from plaintiff's exhibit 71, a Reforestation Cost Analysis prepared by the Forest Service which deals with the Superior National Forest as a whole. Various testimony at trial indicated that the same procedures were used in the BWCA as in the rest of the Superior National Forest, but that the percentages of use might vary somewhat.

59. This method will be hereinafter referred to as the "Ahlgren method" after Mr. Ahlgren, who testified on this method at the trial.

60. A mattock or grub hoe is a small hoe-like tool used to dig the hole in which seedlings are planted.

61. This is true because the mattock is used to cut through the duff.

62. See, notes 66–75 and accompanying text, infra, for a description of the various methods of site preparation.

63. Much of the actual reforestation work is contracted out by the Forest Service.

63(a). Maturity as used here refers to ecological maturity which occurs when a tree reaches its full growth potential after which it tends to decline in "health" (i. e., it may begin to die due to old age). This term must be distinguished from commercial maturity which occurs when a tree's growth rate begins to decline and when the greatest profit can be made by cutting it and starting a new tree in its place. Commercial maturity generally occurs long before ecological maturity.

maturity (which may occur at from 100 to 200 years after regeneration) such a forest will contain approximately 700 trees per acre. In a forest planted with seedlings there is little if any attrition due to overcrowding and so it too will contain approximately 700 trees per acre when it is mature or slightly over-mature. The result is that an area replanted with about 700 seedlings per acre does not appear natural from the standpoint of tree density until it is fully mature. The other unnatural aspects of an area planted with seedlings result from the site preparation method used, if any, and these will be discussed *infra*.

"Natural regeneration" while here termed a method of reforestation is really a lack of such a method. It involves no action whatsoever on the part of the Forest Service and, thus, a complete reliance on nature. The evidence showed that this "method" is effective in only certain areas such as black spruce swamps and 100% aspen areas,[64] but that it is totally ineffective in reproducing the jackpine which is the most common softwood specie in the BWCA.

"Natural regeneration" is often used by the Forest Service in mixed specie areas, with the result that the new forest in such an area is far more sparsely populated by all types of trees, is almost completely devoid of jackpine, contains far fewer other types of softwoods than the forest it replaced and is almost totally dominated by aspen. This is not a natural result since a forest reproduced naturally [64(a)] would contain the same species in about the same ratio as the prior forest and would be about as thickly populated as the prior forest. The other unnatural aspects of an area left to "natural regeneration" result from the site preparation method used, if any, and these will be discussed *infra*.

Seeding is accomplished by several techniques, including in conjunction with the strip and spot scarification site preparation methods which are discussed *infra*, by airplane, by snowmobile and even by hand, and is done only after some site preparation technique—usually rock raking, strip scarification or spot scarification—has been used. Seeding in conjunction with strip and spot scarification is generally undertaken in the spring, summer or fall, while seeding by airplane and snowmobile is usually done in the winter. The Forest Service usually plants a single specie of seed in a given area, and tries to plant enough seed so that about 1000 seedlings come up.

Although seeding is an effective, and perhaps the most natural artificial method of reforestation, it does have sufficient unnatural aspects so that the primitive character of the area seeded is destroyed. The chief unnatural aspect of seeding is that it results in an area almost completely populated by one specie and by trees of the same age while the "typical" type of forest found in the virgin forest areas of the BWCA contains mixed species and tree ages with different mixtures found in different areas. Another such aspect is the great difference in the density of a forest reforested by seeding and a forest regenerated after a forest fire in standing virgin timber.[65] The other unnatural aspects of a seeded area result from the site preparation method used and these will be discussed *infra*.

Site preparation is required before seeding, and it may also be used before seedlings are planted. Site preparation is required because of the thick layer of duff on the forest floor in the BWCA.[66] As noted earlier, before trees that reproduce from seeds can grow, the duff must

64. Black spruce swamps are quite common in the BWCA but 100% aspen areas are rare except where logging has already taken place and "natural regeneration" was relied on.

64(a). That is by a forest fire. *See,* discussion in text at pages 609 to 610, *supra*.

65. *See,* the discussion in text at pages 613 to 614, *supra*. The same considerations apply here, in that natural mortality will reduce the 1000 or so original seedlings to around 700 trees at maturity or slight over-maturity.

66. Duff is defined in note 44, *supra*.

be reduced to a thickness through which roots can reach the soil or be eliminated entirely. In a forest fire or a prescribed burn, the duff is reduced to the proper thickness because it is partially or in some cases fully burned. In order to reduce or eliminate the duff and to otherwise prepare an area for reforestation after logging has been completed, the Forest Service employs various mechanical and chemical site preparation procedures. These procedures, including the approximate per cent of their use, are: [67] rock raking—50%, strip scarification—21%, spot scarification—8%, chaining—7%, the use of hand tools—6%, prescribed burning—6%, other mechanical preparation—1%, and chemical preparation (herbicides)—1%.

Rock raking is a term which is used to describe two similar but distinct site preparation techniques. Both forms of rock raking involve the use of a bulldozer with long teeth on its blade. In the traditional form of rock raking, the bulldozer's blade is used to scrape the duff off of the ground, thus exposing bare soil, and to collect the duff and logging debris like stumps (often including the root systems) and slash. During this procedure rock and soil are collected as well. The matter collected is formed into huge long rows, called windrows, which are often hundreds of feet long and as much as 10 feet high. The newer form of rock raking, called intermittent rock raking, is the same as the traditional form of rock raking except that the matter collected is formed into small piles, generally less than 3 feet high, which are scattered intermittently throughout the logged area.

The evidence, both oral and pictorial, showed that either form of rock raking

ruins the primitive character of the area involved. Most obvious is the visual effect of large windrows or piles of organic matter, rock and soil. The organic matter will often remain visible for up to 100 years before it fully rots, but the rock and soil build-up will remain visible for thousands of years. The rock raking techniques also tend to deplete and reduce the already thin soils of the BWCA by scraping much of the soil and organic matter (which contains nutrients) away from much of the area treated and concentrating it in the windrows or piles which are formed. In hilly areas, rock raking leads to erosion of the exposed soil which further depletes and reduces it. The result of this depletion and reduction of the soil by rock raking is that the new growth is less luxuriant than the old and may be less dense than the old, depending on the reforestation technique used thereafter.

Strip scarification and spot scarification are very similar methods. Strip scarification refers to the use of what is known as a barrel scarifier.[68] The barrel scarifier is dragged on the ground behind a tractor or other vehicle. As it is dragged along, it rotates, the small fins expose bare soil by clearing away the duff and, if seeding is desired, the seed is dropped onto the small cleared areas. Spot scarification refers to the use of what is known as an S.F.I. cultivator.[69] The S.F.I. cultivator is pulled over the ground behind a tractor or other vehicle just like any other cultivator. As it is pulled along, it strips the duff from the soil in spaced circles of about a foot and a half in diameter and, if seeding is desired, the seed is dropped onto the small cleared circles. These two methods of site preparation

---

67. This list and the percentages were derived from plaintiff's exhibit 71, a Reforestation Cost Analysis prepared by the Forest Service which deals with the Superior National Forest as a whole. Various testimony at trial indicated that the same procedures were used in the BWCA as in the rest of the Superior National Forest, but that the percentages of use might vary somewhat.

68. A barrel scarifier is a cone shaped device of varying size with small fins running its full length. It is hollow so that it can hold seeds.

69. An S.F.I. cultivator is a special, Swedish-manufactured cultivator used for preparing a site for seeding and seedling planting.

can only be used in relatively flat, un-rocky areas.

The effects of the strip scarification and spot scarification are very similar. Neither result in the windrows or piles of slash, organic matter, rock and soil that are produced by rock raking, but they do result in some concentration of these things. Both techniques tend to deplete and reduce the soil, as well as to cause erosion in the areas where bare soil is exposed, but not to the degree that rock raking does. The greatest effect of these two methods on the primitive character of the area involved is the somewhat mathematical pattern of the resulting new growth if the barrel scarifier or S.F.I. cultivator are used to seed. That is, strip scarification tends to result in trees growing in rows and spot scarification in trees growing in evenly spaced clumps. These are unnatural results because in naturally regenerated forests, the trees are unevenly spaced.

Chaining is not really a site preparation technique in the sense that bare soil is exposed to aid seeding or the planting of seedlings. It is used in predominantly aspen areas to knock down stands or single trees which are of commercially unmerchantable size. Knocking down such stands or single trees allows them to regenerate by sprouting.[70] The technique consists of the use of two bulldozers a number of feet or yards apart with a chain stretched between them. As the bulldozers move through the forest the chain topples any standing trees in between them.

The result of this technique is somewhat similar to a natural blowdown.[71] The result is only somewhat similar because chaining occurs in or adjacent to areas that have been logged, it causes trees to be dragged along the ground

thereby disrupting the duff, exposing bare soil and allowing erosion to occur, and it may cause the makeup of the forest to change if jackpine was present before the logging since "natural regeneration" is usually relied on in such areas. To the extent that chaining is not the same as a blowdown, it changes the primitive character of the area involved.

The use of hand tools refers to the use of axes or chain saws to cut down trees or groups of trees of commercially unmerchantable size remaining in logged areas. Like chaining, this technique is not really a site preparation technique in the sense that bare soil is exposed to aid in the planting of seedlings or seeding. It is generally used in areas where the terrain is too rough to use the more mechanized techniques of rock raking and chaining.

As in chaining, the result of "the use of hand tools" is somewhat similar to a natural blowdown. The result is only somewhat similar because such cutting occurs in or adjacent to areas that have been logged, it leaves stumps such as would not be left by a blowdown [72] and it may cause the makeup of the forest to change if jackpine were present before the logging since "natural regeneration" is usually relied on in such areas. To the extent that "the use of hand tools" is not the same as a blowdown, it changes the primitive character of the area involved.

Prescribed burning, as used by the Forest Service, usually involves spring burns of either piled slash or spread slash. Spring burns are used to reduce the hazard of the fire getting out of control and entering standing timber,[73] and to insure that the duff is not burned off all the way down to the bare soil. Piled slash usually results from

70. *See*, note 44, *supra*.

71. A blowdown refers to trees or groups of trees, often weak, older trees, which are toppled during high winds.

72. A blowdown would either leave the trees uprooted or with a broken trunk instead of neatly cut down.

73. This is the reason, but note that the Little Sioux Fire described at page 605, *supra*, was a spring burn which got out of control and did enter standing timber, burning over about 16,000 acres.

highly mechanized logging operations which although in the minority in the BWCA are still a substantial portion. Spread slash results from less mechanized operations, that is, those which rely mainly on chain saws, wherein the branches and tops are trimmed off where the tree is felled. The effect of these two methods of prescribed burning on the primitive character of the area involved is quite different.

The evidence showed that prescribed burning of piled slash was not an effective method of reforestation or of protecting, as much as is possible after logging, the primitive character of the area involved. The primary adverse effect of this procedure is that the nutrients in the slash and the jackpine seeds released by the heat are both concentrated in a small area instead of over the whole area logged. The result of this is that the new growth will be fairly lush and there will be many jackpines in the burned area, but the growth in the unburned area will be far less lush and there will be few, if any, jackpines unless the area is seeded or seedlings are planted. Another adverse effect is that the tree stumps in the burned area will rot faster because they have been burned, while those in the unburned area will continue to be visible for a far longer period of time. In addition, this type of prescribed burning only reduces the duff in the small area burned and so some other method of site preparation must then be used unless seedlings are to be planted or the area is to be left to "natural regeneration."

On the other hand, the evidence showed that the prescribed burning of spread slash is the most effective method of reforesting and of protecting the primitive character of an area that has been logged. This method reduces the duff over the whole area logged, chars the tree stumps so they will rot as fast as possible, releases nutrients evenly over the logged area, releases jackpine seeds evenly over the logged area and tends to reduce the visual impact of logging roads and other improvements.[74] While the prescribed burning of spread slash is an effective method, the Ahlgren method[75] is even more effective because the presence of seed trees means that the seed dispersal will be more natural.

In conclusion, the Court finds that logging and the various reforestation methods which follow it destroy the primitive character of the area involved. The amount of this destruction varies considerably depending on the type of logging operation and the reforestation methods used thereafter. Thus, the effects vary from the nearly complete destruction when a highly mechanized logging operation is followed by the traditional form of rock raking and seedling planting or by "natural regeneration" to the nearly natural result of logging with chain saws followed by the prescribed burning of the spread slash. In the former areas, man and his work dominates, and the natural condition of the land is destroyed for thousands of years and perhaps forever. In the latter areas, while man's intrusion is highly visible for many years, it virtually disappears over a longer period of time, at least to the untrained eye. However, in either case, the area loses forever its "primeval character and influence" and "natural conditions."

## CONCLUSIONS OF LAW

### *Standing*

Some of the defendants [76] have alleged that plaintiff lacks standing to

---

74. *See*, notes 39 to 43 and accompanying text, *supra*, for a discussion of the effects of a forest fire in standing timber. Note that the results of prescribed burning of spread slash are very similar to those of such a fire except for the general effects of logging enumerated at page 610, *supra*,

and the fact that the seed dispersal is not the same from spread slash as from standing timber.

75. For a description of this method, *see*, text relating to note 59, *supra*.

76. Northwest, Northern, Boise and Kainz.

maintain this action because no members of plaintiff will suffer injury to a legally protectable right as a result of continued logging in the BWCA. Plaintiff maintains that the fact that many of its members have used the BWCA in the past and intend to continue doing so in the future is sufficient to give it standing to maintain this action.

Defendants rely on Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (hereinafter referred to as *Sierra Club*), to support their contention. The Court notes that *Sierra Club* was brought under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (hereinafter referred to as APA), while the present action was brought under NEPA pursuant to 28 U.S.C. §§ 1331, 1337 and 1361, as well as APA. However, the Court feels that the reasoning of the Supreme Court in *Sierra Club* has a far broader application than to just actions brought under APA.

In that case, the Supreme Court laid down the general rule as to standing where no specific statute authorizing invocation of the judicial process is relied on:

> Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends on whether the party has alleged such a "personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Flast v. Cohen, 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947].[77]

Where a specific statute does authorize invocation of the judicial process, the Court held that the party seeking ju-

dicial review under such a statute must show that "he is himself adversely affected"[78] by the act complained of. The Court, noting that the traditional requirement for standing of economic injury had been broadened to include "aesthetic, conservational and recreational as well as economic values,"[79] went on to hold that the Sierra Club lacked standing, stating that:

> The impact of the proposed changes in the environment of Mineral King will not fall indiscriminately upon every citizen. The alleged injury will be felt directly only by those who use Mineral King and Sequoia National Park, and for whom the aesthetic and recreational values of the area will be lessened by the highway and ski resort. The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents.[80]

. In the present action, the plaintiff did allege and show that many of its members use the BWCA and that they use it in such a way that their use will be significantly affected by logging.[81] Given the reasoning of the Supreme Court in *Sierra Club*, this Court can only conclude that under these circumstances, the plaintiff has standing to bring this action under NEPA pursuant to 28 U.S. C. §§ 1331, 1337 and 1361 and under APA.

### Plaintiff's Right to Bring Action

■■ This title refers to the affirmative defenses of improper authorization of this action by plaintiff's Board and of the action being beyond the scope of

---

77. 405 U.S. at 732, 92 S.Ct. at 1364.

78. 405 U.S. at 740, 92 S.Ct. at 1368.

79. 405 U.S. at 738, 92 S.Ct. at 1368.

80. 405 U.S. at 735, 92 S.Ct. at 1366.

81. *See,* disscussion in text at page 597, *supra.*

plaintiff's corporate purpose claimed by the government and certain other of the defendants.[82] The Court considers these defenses to be little more than make-weights arguments since it finds that this action is clearly within the plaintiff's corporate purpose "to promote the public interest and social welfare" as those terms were defined by those testifying on behalf of plaintiff and that there is no doubt that this action was properly authorized by plaintiff's Board in accordance with its By-laws.[83]

### Laches

As an affirmative defense, all the defendants allege that the plaintiff was guilty of laches in bringing this action and should therefore be denied equitable relief. Laches is an equitable defense which denotes unreasonable delay in bringing an equitable action. If there is such a delay by the plaintiff, resulting in prejudice to the party asserting the defense, then equitable relief will be denied.[84] Recent cases have made it clear that laches applies in environmental cases.[85]

In regard to the question of prejudice, there is no question that the timing of this law suit was unfortunate from defendants' viewpoint. Suit was filed on November 24, 1972, immediately prior to the beginning of the winter logging season. There was testimony to the effect that if this action had been brought earlier in the year, the private defendants and the loggers under contract with them may have been able to find alternate sources of timber for this winter.[86] The Court concludes that the private defendants and their loggers were somewhat prejudiced by the timing of this suit.

However, in considering all the circumstances, the Court must also conclude that plaintiff did not unreasonably delay the filing of this action. In fact, the Court finds that the plaintiff was diligent, and even persistent, in pressing its position on the Forest Service, first through administrative channels and finally by bringing suit. Certainly, any unnecessary delay in instigating this suit was not the result of plaintiff "sleeping on its rights."

As early as October 1971, representatives of MPIRG contacted the Forest Service and expressed their concern over logging in the BWCA. In a letter, dated November 18, 1971, to the Acting Secretary of Agriculture, the Supervisor of the Superior National Forest, the Regional Forester, the Chairman of the Council on Environmental Quality and the Chief of the Forest Service, plaintiff requested that an impact statement be prepared considering the effects of commercial logging in the BWCA, and that further logging be halted in the interim. T. K. Cowden, Assistant Secretary of Agriculture, replied by way of a letter, dated January 3, 1973, in which he stated that the Department of Agriculture was not willing to unilaterally terminate existing contracts for timber sales at that time. However, Mr. Cowden did in-

82. *See*, page 588, *supra*, wherein these defenses are more fully described.

83. *See*, the findings of fact relating to these issues on pages 596–597, *supra*.

84. *See generally*, Dun.Dig. §§ 5350 and 5351 (1953).

85. *See*, Clark v. Volpe, 342 F.Supp. 1324 (E.D.La.1972), affirmed, 461 F.2d 1266 (5th Cir. 1972); Pennsylvania Environmental Council v. Bartlett, 454 F.2d 613 (3rd Cir. 1971).

86. On the other hand, the private defendants, except Kainz, were informed by the Forest Service that the plaintiff was "requesting that cutting on all BWCA timber sales be suspended until an enviromental impact statement is prepared" in letters dated December 6, 1971. Prudence would have dictated that those defendants at least determine what alternative sources of timber were available, if not actually procure such sources. In any event, the private defendants did learn of this action at various times in early December 1972 when they were served, and they were requested to notify their loggers on timber sales in the BWCA of the possibility of an injunction at a pretrial conference held on December 12, 1972.

dicate that the entire Management Plan in the BWCA was undergoing substantial review. In a letter from the Chairman of the Counsel on Environmental Quality to Congressman Fraser,[87] dated February 1, 1972, it was promised that a "draft" impact statement would be available for public review in August, 1972, well before the beginning of the winter logging season.

In April, 1972, upon learning that the completion of the "draft" impact statement would be delayed until April, 1973, plaintiff requested the Forest Service to complete that portion of the statement that would deal with logging by August, 1972. To appease plaintiff, it was announced that a "Preliminary Environmental Analysis" (hereinafter referred to as the preliminary analysis) of logging in the BWCA would be available for public review in August, 1972. Plaintiff received a copy of the preliminary analysis with a letter dated September 29, 1972. After determining that the preliminary analysis was totally insufficient for its purposes, plaintiff made one more attempt at arriving at an amicable solution. In letters of October 20 and November 6, 1972, plaintiff suggested that the Forest Service suspend logging in the BWCA "pending determination of future management direction" and compensate the present private defendants with timber from outside the BWCA. This suggestion was rejected by Harold Andersen, Supervisor of the Superior National Forest, in a letter dated November 15, 1972, and plaintiff filed this action on November 24, 1972.

The government now contends that its position of January 3, 1972, not to alter existing timber contracts, was fixed and not subject to change. Defendants maintain that the action could have been and should have been instituted at that time, or, at the latest, in April, 1972 when MPIRG first learned of the delay in the "draft" impact statement from August, 1972 to April, 1973. Plaintiff however relied on the representations of the government that the BWCA Management Plan was under review, and that a preliminary analysis addressed to the issue of continued logging in the BWCA would be completed before the winter logging season. The Forest Service had modified existing timber sale contracts in the past[88] and plaintiff believed and hoped that after a review of the situation, additional modifications would be made. It is the opinion of the Court that plaintiff's reliance on the representations of the government was justified and reasonable.

### Application of NEPA

■ Having concluded that plaintiff has standing to bring this action, that this action was duly authorized by plaintiff's Board of Directors, that this action is within the scope of plaintiff's corporate purpose as set out in its Articles of Incorporation and that plaintiff was not guilty of laches, the Court reaches the basic issue in dispute. That issue is whether the actions taken by the Forest Service after January 1, 1970 in regard to the eleven active timber sales in the BWCA and pursuant to the BWCA Management Plan adopted on August 12, 1969, amount to "major Federal actions significantly affecting the quality of the human environment" within the meaning of § 102(2)(C) of NEPA.[88(a)] If it is determined that this was the case, then an impact statement should have been prepared by the Forest Service prior to such actions pursuant to § 102(2)(C) of NEPA. On the other hand, if it is determined that this was not the case, then the Forest Service was quite correct in not preparing an impact statement until the new BWCA Management Plan is formulated.

87. Congressman Fraser had written a letter to the Council on January 7, 1972, in behalf of plaintiff's effort to obtain an impact statement.

88. *See,* discussion in text at pages 604–609, *supra.*

88(a). § 102(2)(C), 42 U.S.C. § 4332(2)(C), is quoted at pages 593–594, *supra.*

Counsel have supplied the Court with exhaustive briefs setting forth those cases in which actions of the federal government have been held to be major actions with a significant effect on the human environment, thus requiring an impact statement,[89] as well as those cases in which an impact statement was held not to be required.[90] After reviewing these and other cases on point, it is clear that whether an impact statement is required in any given situation can only be determined on a case by case analysis.

Of major importance in determining whether an impact statement is required in the instant case is the fact that the BWCA has been designated by Congress as a wilderness area with the intent that its primitive character would be preserved. Parker v. United States, 448 F. 2d 793 (10th Cir. 1971) shows the importance of preserving wilderness land. In that case, the District Court enjoined execution of a Forest Service contract with a lumber company involving the sale of timber located in an area of wilderness value, contiguous to the Gore Range-Eagles Nest primitive area. The injunction also required the Forest Service to study the area and to include it in the Secretary of Agriculture's wilderness study report to the President and Congress. While the Wilderness Act, rather than NEPA was involved, the Tenth Circuit recognized the need to prevent the destruction of a wilderness area by logging before a decision as to its proper management could be made. The Court explained:

> We have no difficulty in recognizing the general purpose of the Wilderness Act. It is simply a Congressional acknowledgement of the necessity of preserving one factor of our natural environment from the progressive destruction and hasty inroads of man, usually commercial in nature, and the enactment of a "proceed slowly" order until it can be determined wherein the balance between proper multiple uses of the wilderness lies and the most desirable and highest use established for the present and future. 448 F.2d at 795.

It is the defendants' position that the actions of the Forest Service in regard to timber sales in the BWCA since the effective date of NEPA, January 1, 1960, have been insubstantial and have not had a significant effect on the human environment. They maintain that the major policy decisions involved in regard to timber sales in the BWCA were reached prior to January 1, 1970, and that since that date the Forest Service has merely given effect to past determinations of policy. Furthermore, they argue that the impact on the environment of each individual sale is insignificant in light of the vast acreage of virgin forest in the BWCA and especially that located in the Interior Zone. The plaintiff asserts that the Forest Service's administration of the timber sales in the BWCA since the effective

89. *E. g.*, Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 728, 325 F.Supp. 749 (E.D.Ark.W.D.1971), affirmed, 470 F.2d 289 (8th Cir. 1972) ; Brooks v. Volpe, 460 F.2d 1193 (9th Cir. 1972) ; Calvert Cliffs Coordinating Committee v. United States, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971) ; Minnesota Environmental Control Citizens Association v. United States Atomic Energy Commission, No. 4–72 Civ. 109 (D.C.Minn., July 28, 1972) (hereinafter referred to as MECCA) ; Keith v. Volpe, 352 F.Supp. 1324 (C.D. Cal.1972) ; Lee v. Resor, 348 F.Supp. 389 (M.D.Fla.1972) ; Northside Tenants' Rights Coalition v. Volpe, 346 F.Supp. 244 (E.D.Wis.1972) ; Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167 (S.D. Iowa, 1972) ; Kalur v. Resor, 335 F. Supp. 1 (D.C.D.C.1971).

90. E. G., Raglund v. Mueller, 460 F.2d 1196 (5th Cir. 1972) ; Hanley v. Mitchell, 460 F.2d 640 (2nd Cir. 1972) ; Kisner v. Butz, 350 F.Supp. 310 (N.D.W.Va. 1972) ; Morris v. TVA, 345 F.Supp. 321 (N.D.Ala.1972) ; Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D. Cal.1972) ; Roe v. Morton, No. 3–4049 (D.C.Colo.1972).

date of NEPA constitutes major federal action. In determining whether or not such administrative actions have a significant effect on the environment, plaintiff maintains that the cumulative effect of all of the actions taken pursuant to that portion of the present BWCA Management Plan which deals with logging must be considered in determining whether the Forest Service should have prepared an impact statement.

The Court is persuaded by the plaintiff's arguments. It is the Court's conclusion that the cumulative effect of the administrative actions of the Forest Service taken since January 1, 1970 in regard to timber sales in the BWCA constitute major federal actions that have had and continue to have a significant effect on the human environment. Therefore, an impact statement should have been prepared by the Forest Service on the management policy dictating such administrative actions.

It should first be pointed out that there is no evidence that it would have been impractical for the Forest Service to file an impact statement in relation to its continuing administration of timber sales in the BWCA after the effective date of NEPA. In fact, the evidence is to the contrary. This matter is unlike cases dealing with construction of buildings and highways in which it may make little sense to require an impact statement after the project is well under way. In such situations, there may be an irrevocable commitment of resources to the policy decisions previously made, and thus, any review of the environmental impact of such action may be untimely. However, in the instant case, the Court finds no such irrevocable commitment to past policy decisions. The For-

est Service is continually involved in making policy decisions on a day to day basis,[91] and, in fact, government witnesses testified that the procedures and policies involved in the administration of timber sales in the BWCA are constantly under examination and subject to change.

In addition to the daily, routine administrative matters, the Forest Service has granted extensions in the termination date of six [92] of the eleven active timber sales in the BWCA since the effective date of NEPA. It has done so pursuant to a policy of automatically granting such extensions if the sale is not completely logged by its termination date. The Forest Service and all the defendants take the position that extensions, unlike new timber sales, are not major federal actions within the meaning of NEPA.[93] The Court cannot agree. Instead, the Court finds that extensions are tantamount to new sales and as such are a part of the totality of administrative actions which amount to major federal action. The Forest Service is under no legal compunction to grant extensions. The sales which were extended all contained substantial amounts of uncut timber at the time they were extended. Thus, the extension of such sales involves a policy decision by the Forest Service to dedicate large expanses of a wilderness area to commercial purposes. If the Forest Service had not granted these extensions, many areas which have now been logged would have retained their primitive character.

The Forest Service has also entered into agreements to modify seven [94] of the eleven active timber sales in the BWCA since the effective date of NEPA. There was testimony to the ef-

91. These types of decisions are described at pages 609–610, *supra*.

92. The Shell Lake, Jerry Creek, Old Road, East Road Block, East Tofte and Black Spruce Sales.

93. The Forest Service gave credence to this position by not entering into any new timber sale contracts after January 1, 1970.

94. The Shell Lake, Sunnydale, Beartrap, Old Road, East Road Block, East Tofte and Black Spruce Sales.

fect that many of these modifications were for "environmental reasons," and so the Court must conclude that these modifications had some effect on the environment and therefore must be considered along with other Forest Service actions in deciding this issue.

Clearly, the Forest Service has been actively involved in making policy and administrative decisions and in taking actions thereon in regard to logging in the BWCA since the effective date of NEPA. It is the conclusion of the Court that these decisions and actions, when taken in total, amount to major federal action significantly affecting the human environment.

■ Furthermore, the Council on Environmental Quality's Guidelines for Federal Agencies indicate, wherever possible, that an impact statement should be prepared on those ongoing federal programs initiated prior to 1970 that have a significant effect on the environment.[95] Thus, since it is clear that logging has a significant impact on the environment and that the Forest Service could have prepared an impact statement sooner, such a statement should have been prepared even though the Forest Service concluded that its administrative actions after the effective date of NEPA were merely ministerial pursuant to the BWCA Management Plan initiated prior to 1970. Even if not started until after the Council's Guidelines were issued on April 23, 1971, such an impact statement should have been completed long before the Forest Service's present target date of April, 1973.

Moreover, the Forest Service's own rules and regulations indicate that an impact statement should have been prepared at an earlier date. Those rules and regulations recognize the importance of preparing an impact statement when dealing with wilderness areas. On July 13, 1971, under the signature of John McGuire, Associate Chief, the Forest Service issued Emergency Directive No. 1 dealing with impact statements. Section 1941.22 of that Directive provides that:

*Plans, Programs and Major Projects.* Environmental Statements will be prepared on major proposed plans, programs, and major projects directly undertaken by the Forest Service, or supported in whole or in part through land use permits, leases, contracts, grants, cooperative agreements, subsidies, technical assistance or granting of rights.

1.) In most cases, any activity that will significantly affect the following will require an Environmental Statement.

\* \* \* \* \* \*

b. Formally classified areas, such as Wilderness Areas, Primitive Areas, Wild and Scenic Rivers, National Recreation Areas, Natural Areas, Scenic Areas, Historical Areas, Archeological Areas, Geological Areas, and National Trails.[96]

Emergency Directive No. 1 also provides that in determining whether or not an impact statement should be prepared, the Forest Service should consider the cumulative effect of many small actions in addition to various other factors.[97]

95. Section 11 provides, in part, that: Application of section 102(2)(C) procedure to existing projects and programs. To the maximum extent practicable the section 102(2)(C) procedure should be applied to further major federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the act on January 1, 1970.
Environmental Reporter, Federal Laws, § 71:0304.

96. Forest Service Manual, § 1941.22.

97. Section 1941 of the Directive provides that:
The following categories of criteria should be considered by officials in determining whether or not a statement is appropriate.
1.) Degree of Eco System disturbance. Both on-site and off-site effects should be recognized.
2.) Irreversible effects on basic resources. Short term vs. long term commitments.

The Court believes that a fair and impartial consideration of the provisions of Emergency Directive No. 1 and of the fact that the BWCA is a Wilderness Area by the Forest Service would have led it to the inescapable conclusion that an impact statement should have been prepared. For instance, looking at the criteria set out in § 1941 of the Directive which are listed in note 97, *supra*, the evidence showed that logging results in a high degree of eco-system disturbance, that logging has an irreversible impact on the BWCA, that many small actions have been taken in regard to logging in the BWCA by the Forest Service, that the BWCA is an important national resource, that the BWCA is a unique and a rare resource and that there has been public controversy over logging in the BWCA. Thus, of the eight criteria listed in § 1941, at least six and perhaps more are involved in the controversy over logging in the BWCA.

The Court concludes that in light of NEPA, the Council on Environmental Quality's Guidelines and the Forest Service's own Emergency Directive No. 1, it is abundantly clear, and has been abundantly clear since NEPA became law, that the Forest Service should have prepared an impact statement on logging in the BWCA as soon after the effective date of NEPA as practicable. Its failure to comply with the mandate of NEPA and the Guidelines, rules and regulations promulgated thereunder is arbitrary, capricious and unlawful.

### Injunctive Relief

It having been determined that the Forest Service did violate NEPA, the question of what the proper remedy is must be reached. Plaintiff seeks an injunction proscribing continued logging in the BWCA pending completion of the new BWCA Management Plan and accompanying impact statement by the Forest Service since it may be determined therein that logging is inconsistent with the goal of preserving the BWCA as a wilderness area and should therefore be prohibited. Plaintiff reasons that if the latter determinations are made they would be at least partially negated by any further logging since logging is an irreversible process, while if such determinations are not made the areas which were not logged due to an injunction could be logged in the future.

The defendants' position is that logging should be allowed to continue as planned until the new BWCA Management Plan and accompanying impact statement are completed. Several reasons have been enunciated to support this position. Foremost among these is what the defendants assert to be a Congressional mandate in the Wilderness Act that logging be allowed in the BWCA. In addition, defendants assert that NEPA violations do not require the issuance of an injunction and that a balancing of the equities can only result in the conclusion that injunctive relief should not be granted.

This case is in a somewhat unusual posture because the trial on the merits for a permanent injunction has been combined with the hearing on plaintiff's motion for a preliminary injunction.[98] In this posture, the standards for both a preliminary and a permanent injunction must be considered.

---

3.) Cumulative effects of many small actions.
4.) Chain reactions or secondary effects of interrelated activities.
5.) National versus regional and local importance.
6.) Uniqueness or rareness of resource.
7.) Precedent setting cases.
8.) Scope of anticipated public involvement and controversy anticipated. Forest Service Manual, § 1941.

98. The injunction sought by plaintiff would be permanent in that it would be binding until the Forest Service completes its new BWCA Management Plan and accompanying impact statement. However, the Court has held certain issues raised by the parties in abeyance until after the Forest Service has completed its work. *See*, discussion in text at pages 587 to 589, *supra*.

In considering an application for a preliminary injunction, the Court must consider four basic factors: [99]

1. The probability that the plaintiff will eventually succeed on the merits;

2. The presence of immediate and irreparable injury to the plaintiff;

3. The possibility of injury to the defendant; and

4. Any public interest involved.

In determining whether or not a permanent injunction should be issued, the Court must first determine if the plaintiff has proven its case, that is, if plaintiff has actually succeeded on the merits.[100] If the plaintiff is found to have succeeded on the merits, the Court must proceed to "balance the equities" in determining whether an injunction should be issued, and, if so, what form it should take.[101] In balancing the equities, the Court must consider various things, including the last three factors to be considered in regard to a preliminary injunction.

Since the Court has reached a decision on the merits in this case, there is obviously no need to reach the issue of the probability of plaintiff's success as required in the consideration of a motion for a preliminary injunction. However, the probability of plaintiff's success in convincing the Forest Service that all logging should be prohibited in the BWCA should be considered. This is important because an injunction might not be warranted if there was little or no chance that the Forest Service would decide to prohibit logging. Since the evidence clearly showed that logging destroys the primitive character of the area involved and the Wilderness Act mandates that the primitive character of the BWCA be maintained, the Court must conclude that there is a strong possibility and, in fact, a probability, that further logging in the BWCA will be entirely prohibited or be restricted to non-virgin forest areas under the Forest Service's new BWCA Management Plan.

The immediate and irreparable harm to plaintiff is clear. The plaintiff has shown that many of its members use and enjoy the BWCA for its primitive recreational value, and that others have used it for scientific research on various wilderness phenomena. Plaintiff has further shown that such use and enjoyment is ruined or reduced in those areas which have been logged, or, to put it another way, that such use and enjoyment is only possible in the virgin forest areas of the BWCA. If logging is allowed to continue in such areas pending the Forest Service's completion of its new BWCA Management Plan and the accompanying impact statement, they will be further reduced and the members of plaintiff who intend to use the BWCA in the future will be irreparably harmed.

The Court finds that there is little or no possibility of substantial injury to the defendants as a result of the injunction sought by plaintiff. The government defendants, or in reality, the Forest Service, may later be held liable for damages to some or all of the private defendants for injuries suffered by the latter as a result of the Forest Service's violation of NEPA. However, these possible damages are attributable to the actions, or rather the inaction, of the Forest Service, and cannot justify denying plaintiff the relief it is entitled to. As to the loss of income to the Forest Service which would result from a discontinuation of logging in the BWCA, the evidence showed that the Forest Service would actually benefit from such a discontinuation since reforestation costs exceed the amount realized from the sale of timber.[101(a)]

99. *See,* Van Hoven Co. v. Stans, 319 F. Supp. 180 (D.C.Minn.1970) ; Cox v. Northwest Airlines, 319 F.Supp. 92 (D.C.Minn.1970).

100. *See generally,* 7 Moore's Federal Practice Par. 65.18 [3] (1972).

101. *Id.*

101(a). *See,* discussion in text at pages 611 to 613, *supra.*

The private defendants, except Kainz, would not be greatly injured by an injunction proscribing all logging in the BWCA pending the Forest Service's impact statement because they all have enormous reserves of timber of the same type that they planned to have cut in the BWCA this winter.[102] Thus, the only injury to the private defendants, except Kainz, will be the increased costs, if any, of having more timber cut on their own land or on their other timber sales.[102(a)] Kainz is in a special position because it relies almost entirely on the saw wood quality timber obtained from the Beartrap Sale to keep its sawmill running, and so the Court concludes that Kainz would be greatly and perhaps irreparably injured if it were proscribed from cutting timber on the Beartrap Sale unless substitute saw wood quality timber is made available to it.[102(b)]

The public interest involved here is twofold. First is the public interest in setting aside and preserving the BWCA and other wilderness areas in their primitive states. This public interest was enunciated by Congress in the Wilderness Act,[103] and is thus the primary public interest to be considered in this matter.

Second is the local public interest in the economic value of the employment and income generated by the timber industry. The evidence showed that none of the private defendants would go out of business or even have reduced business if logging were enjoined in the BWCA, but several of the private defendants did testify that they could provide no other logging work for the logger or loggers on their timber sales in the BWCA should logging there be enjoined. However, the Court has found that any of the private defendants could, if they so desired, provide the loggers on their timber sales in the BWCA with other areas to cut on their own land or on federal, state or county timber sales owned by them.[104] In addition, the evidence showed that there has been a surplus of small state timber sales located near the BWCA, that many such timber sales have remained unsold in recent years, that these sales are meant for smaller buyers like many of the loggers involved in cutting timber in the BWCA and that such loggers could have purchased or at least bid on these sales before and could seek to purchase them now.[105]

In conclusion, the Court finds that there is a very real possibility that plaintiff and other groups with similar views will convince the Forest Service to eliminate logging in the BWCA or at least in the virgin forest areas thereof, that plaintiff may well be irreparably harmed if logging is allowed to continue and the Forest Service is so convinced, that there is little or no possibility of substantial injury to the defendants as a result of the injunction sought by plaintiff and that the dominant public interest in this regard is that the BWCA be maintained in its primitive state. Therefore, when the factors which must be considered in determining whether to grant a preliminary injunction are considered, it is clear that they weigh heavily on the side of granting an injunction.

---

102. *See*, discussion in text at pages 597 to 601, *supra*. Note that since the Court has proscribed logging only in those areas of the present timber sales that are contiguous with large areas of virgin forest, many of the private defendants have been able to continue having timber cut on some or all of their timber sales in the BWCA.

102(a). See, discussion in text at pages 597 to 601, *supra*.

102(b). Such substituted timber has been made available to Kainz pursuant to the Court's order of February 2, 1973.

103. *See*, the various provisions of the Wilderness Act quoted at pages 590–591, *supra*. *See also*, discussion in text at pages 594–596, *supra*, and at pages 628–630, *supra*.

104. *See*, discussion in text at pages 597 to 601, *supra*.

105. *See*, discussion in text at page 604, *supra*.

The factors which have already been discussed in regard to a preliminary injunction must also be considered as a part of the process of "balancing the equities" required to determine if a permanent injunction should be issued. In addition to such factors, the defendants have urged the Court to consider the fact that the area planned for logging before April, 1973 when the Forest Service has represented that its new BWCA Management Plan and the accompanying impact statement would be completed is "insignificant" in relation to the total area of the BWCA, that the plaintiff was guilty of laches or at least undue delay in bringing this action, that NEPA violations do not require the issuance of an injunction and, most importantly, that the Wilderness Act mandates that logging be allowed to continue in the BWCA.

The defendants are correct that the area planned for logging this winter, about 3,000 acres, is a very small percentage of the total BWCA area. In fact, that 3,000 acres is far less than 1% of the total area of the BWCA. However, this 3,000 acre figure refers only to the areas where the timber is actually cut and not to the total number of acres affected by the logging which may be considerably greater. This is due to the fact that within the total area of each sale only certain specific areas are delineated for logging while the remaining areas are omitted because they contain mostly commercially unmerchantable timber like aspen, birch or softwoods that are commercially immature. Therefore, the total area which would be affected by the logging planned for this winter would be greater than the 3,000 acres which will actually be cut, but would still be a rather small percentage of the BWCA as a whole.

Even though this is true, the Court concludes that such logging is signifi-

cant. First, and most importantly, the Court must conclude that any adverse effect on the BWCA, even if minor in relation to the total area thereof, is significant because of the BWCA's unique character.[106] That is, the Court concludes that any activity which tends in any way to destroy or adversely affect the primitive character of the BWCA, is, in and of itself, significant. Second, the Court notes that much of the 3,000 acres to be logged this winter is part of the main virgin forest areas of the BWCA which only total about 520,000 acres. It is these areas where logging is having its greatest impact (i.e., by destroying the primitive character of these formerly virgin areas). Logging in areas which have already been logged to some extent or which are surrounded by previously logged areas has relatively little impact since the primitive character of such areas has already been destroyed. Third, the Court is concerned about what has been called the "nibble effect". The "nibble effect" refers to the process whereby the Forest Service makes a timber sale that carves out an incursion into a virgin forest area and then uses that incursion to justify further timber sales in that area. The Court feels that some of the areas to be cut this winter may be used to justify additional timber sales in the future, and thus may well have an effect on an area far larger than the area physically affected by the logging planned for this winter.

Defendants' laches and undue delay arguments were considered earlier[107] with the Court concluding that plaintiff was not guilty of these things and, in fact, that it had acted reasonably and responsibly in light of the Forest Service's actions.

The defendants correctly assert that NEPA violations do not require the issuance of an injunction.[108] However, it is equally clear that injunctions may

106. *See,* discussion in text at pages 593 to 596, *supra.*

107. *See* discussion in text at pages 618–620, *supra.*

108. *See,* MECCA, note 89, supra; Environmental Defense Fund, Inc. v. Froehlke, 348 F.Supp. 338, 354–356 (W.D.Miss. 1972); Environmental Defense Fund, Inc. v. Armstrong, 352 F.Supp. 50 (N.D. Cal.1972).

be issued as a remedy for such violations.[109] In MECCA,[110] this Court held that an impact statement was required in connection with the continued construction of two nuclear power plants despite the fact that both plants had their origins prior to the effective date of NEPA. However, since a substantial amount of construction had already taken place by the time of the law suit, this Court held that an injunction pending the filing of the impact statement was not necessary to preserve the rights of the plaintiffs and to ensure a meaningful review by the agency.

In the present case, the considerations are significantly different. Whereas many of the active timber sales in the BWCA are small sections of areas which already have been logged or are cut off from the main virgin forest areas of the BWCA by large areas which have been logged, many involve areas of virgin forest that are contiguous with the main virgin forest areas of the BWCA. While the logging planned for this winter represents relatively small intrusions into such areas, it is nonetheless true that they would be significant intrusions.[111]

It is clear from the evidence at trial that if the forest is to survive, it cannot be placed in a deep freeze. In nature, forest fires periodically swept the forest, clearing away the older forest and sparking the growth of a new generation of forest plant life. Such a cycle is vital to the continued existence of a natural forest in the BWCA. As a consequence, if the BWCA is to retain its primitive character for generations to come, there must be some plan of forest management that allows for the destruction of the older forest so that a new forest can be regenerated. Inasmuch as fire was nature's tool, many, including plaintiff, favor the use of prescribed fires in standing timber. As radical as this concept may first appear, the theory has a great deal of support and, in fact, is being used to some degree in various other forest areas in the United States. Others, including the private defendants, maintain that logging followed by certain methods of reforestation can accomplish the same goal without "wasting" the economically valuable timber.

This Court does not have to settle this dispute at the present time,[112] but hopefully, the Forest Service will do so or will at least decide some of the issues involved in preparing its new BWCA Management Plan and accompanying impact statement. The decisions involved in that process will be made only after a great deal of study and reflection. It is totally inconsistent with the policies behind NEPA and the Wilderness Act to allow further logging in the BWCA, or at least in the virgin forest areas thereof, before these decisions can be made.

Finally, defendants contend that NEPA cannot be construed in isolation but must instead be construed in conjunction with other statutes and regulations, and especially the Wilderness Act. The Court fully agrees with this contention.[113] Defendants further contend that when this is done it becomes clear that Congress and the Secretary of Agriculture intended "to continue timber activity within the BWCA" in view of the "without unnecessary restrictions on other uses, including that of timber"

109. See, cases cited in note 108, supra; SCRAP v. United States, 346 F.Supp. 189 (D.C.D.C.1972) ; Calvert Cliffs Coordinating Committee v. United States Atomic Energy Commission, note 89, supra; Northside Tenants Rights Coalition v. Volpe, note 89, supra.

110. See, note 108, supra.

111. See, discussion in text at page 627, supra.

112. However, this Court may eventually have to settle this dispute since the issues raised by plaintiff's second amended complaint and several of the defendants' counterclaims are being held in abeyance until the Forest Service completes its new BWCA Management Plan and accompanying impact statement.

113. See, discussion in text at pgs. 620–624, supra.

language in the Wilderness Act,[114] and the Secretary's regulations adopted pursuant thereto.[115] They assert that since logging in the BWCA is mandated by the Wilderness Act, it could not be stopped by the Forest Service pending the completion of its impact statement and it should not be stopped by this Court pending such completion even if it has been determined that the Forest Service violated NEPA. The Court cannot agree.

The Court feels that defendants' interpretation of the Wilderness Act is not warranted. The language used makes it clear that the Secretary of Agriculture is to enunciate and enforce any and all restrictions which are necessary to maintain the primitive character of the BWCA. It is only if a restriction is not necessary to fulfill this purpose that it can be challenged as "unnecessary". Where there is a conflict between maintaining the primitive character of the BWCA and allowing logging or other uses, the former must be supreme. Thus, if the conclusion of the Forest Service's upcoming impact statement is that logging irretrievably destroys the primitive character of the area involved it must act to halt such logging pursuant to the specific terms of the Wilderness Act.

In a similar analysis in Izaak Walton League v. St. Clair, et al., 353 F.Supp. 698 (D.C.Minn., 1973), Judge Neville enjoined all further mineral exploration in the BWCA despite 16 U.S.C. § 1133(d)(2), a special provision of the Wilderness Act dealing with mineral activities, which provides, in pertinent part, that:

> Nothing in this chapter shall prevent within national forest wilderness areas any activity, including prospecting, for the purpose of gathering information about mineral or other resources, if such activity is carried on in a manner compatible with the preservation of the wilderness environment.

Judge Neville concluded that:

> A Wilderness purpose plain and simply has to be inconsistent with and antagonistic to a purpose to allow any commercial activity such as mining within the BWCA. . . . There can be no question but that full mineral development and mining will destroy and negate the wilderness or most of it. . . .
>
> It is clear that wilderness and mining are incompatible. Wilderness exists because man has not yet intruded upon

114. This language is found in 16 U.S.C. § 1133(d)(5) quoted at page 591, *supra.*

115. These regulations are codified at 36 C.F.R. § 251.85 which provides in part, that:

> Subject to existing private rights, the lands now owned or hereafter acquired by the United States within the Boundary Waters Canoe Area of the Superior National Forest, Minn., as formerly designated under Reg. U–3 (§ 251.22) and incorporated into the National Wilderness Preservation System under the Wilderness Act of September 3, 1964, shall be administered in accordance with this regulation for the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the Area, particularly in the vicinity of lakes, streams, and portages.

> (a) In the management of the timber resources of the Boundary Waters Canoe Area, two zones are established:
>
> (1) An Interior Zone, in which there will be no commercial harvesting timber. . . .
>
> (2) A Portal Zone which will include all the Boundary Waters Canoe Area not designated as Interior Zone. Timber harvesting is permitted in the Portal Zone under conditions designed to protect and maintain primitive recreational values. Timber within 400 feet of the shorelines or lakes and streams suitable for boat or canoe travel or any portage connecting such waters will be specifically excluded from harvesting, and timber harvesting operations will be designed to avoid unnecessary crossings of portages. Timber sale plans will incorporate suitable provisions for prompt and appropriate cover restoration.

it. As the United States was settled and frontiers vanished, wilderness disappeared except for inaccessible or otherwise then commercially useless areas. As of today but few true wilderness areas remain. Once penetrated by civilization and man made activities, it cannot be regained for perhaps hundreds of years. The recovery period is meaningless for generations to come. The destruction is irreversible. So with mining, logging off and other activities, they are anathema to all wilderness values. . . .

If the premise is accepted that mining activities and wilderness are opposing values and are anathema each to the other, then it would seem that in enacting the Wilderness Act Congress engaged in an exercise of futility if the Court is to adopt the view that mineral rights prevail over wilderness objectives. . . . There is an inherent inconsistency in the Congressional Act and it falls in the lap of the court to determine which purpose Congress deemed most important and thus intended. In this court's opinion the Wilderness objectives override the contrary mineral right provision of the statute . . . . 353 F.Supp. at 714.

The Court concludes that the Wilderness Act and the regulations promulgated thereunder do not, in any way, preclude this Court from granting plaintiff injunctive relief.

After considering all the factors enumerated above, the Court has reached the conclusion that the plaintiff is entitled to injunctive relief in this case, i.e., that defendants be proscribed from logging or allowing logging in those areas of the active timber sales on the BWCA which are contiguous with the main virgin forest areas of the BWCA pending the Forest Service's completion of its new BWCA Management Plan and accompanying impact statement. The Court attempted to accomplish this result in its Order of February 2, 1973, and the amendment thereto of February 8, 1973, and now reaffirms that Order and amendment.

It is so ordered.